HERITAGE HOMES OF ATTLEBORO, INC., Plaintiff,

v.

The SEEKONK WATER DISTRICT, Defendant.

Civ. A. No. 77–1251–C.

United States District Court,
D. Massachusetts.

Sept. 3, 1980.

Michael J. Duggan, Stephen D. Clapp, Armstrong, Pollis & Clapp, North Attleboro, Mass., for plaintiff.

William E. Hickey, Quincy, Mass., John J. Grahan, Boston, Mass., for Seekonk Water District.

Alvin Jack Sims, Brockton, Mass., for Barbara R. Mann.

Larry Kenna, Lawrence B. Litwak, Choate, Hall & Stewart, John A. Nadas, Boston, Mass., for defendants Devine and Tortolani.

MEMORANDUM

CAFFREY, Chief Judge.

After remand this matter came before the Court for further proceedings.

In 1977 a three count complaint was filed by plaintiff Heritage Homes and its president, Roger DesVergnes, against the Seekonk Water District (the District) and three individual defendants. The complaint alleged that Heritage Homes' application for inclusion of its land in the Seekonk Water District was denied by the District with the intent to discriminate against black or low income persons in violation of 42 U.S.C. §§ 1981, 1983, 1985(3) and the thirteenth and fourteenth amendments of the United States Constitution.

In its orders of April, 1978 and January, 1979 this Court dismissed the complaint and the amended complaint for failing to state a cause of action *DesVergnes v. Seekonk Water District,* 448 F.Supp. 1256 and *DesVergnes v. Seekonk Water District,* 463 F.Supp. 686. After an appeal was filed the three individual defendants were dropped from the suit leaving only the District as appellee. The Court of Appeals affirmed the judgment of dismissal as to DesVergnes on all counts and as to Heritage Homes on Count II. However the Court ruled that Heritage Homes had stated a claim against the District under 42 U.S.C. § 1983 (Count I) and also under § 1981 (Count III), *DesVergnes v. Seekonk Water District,* 601 F.2d 9 (1979).

In its decision the Court of Appeals ruled (1) that the complaint set forth a "case or controversy" within the meaning of Article III; (2) that Section 1981 creates an implied right of action for Heritage Homes against any person who with racially discriminatory intent injured it because it had contracted with black persons in the past; (3) that Heritage Homes also has standing under Section 1983 because a State may not discriminate against a corporation for its willingness to contract with blacks, (4) that a municipal corporation such as the District could be held liable under both Section 1981 and Section 1983, and (5) that the District's liability under Sections 1981 and 1983 could be premised on a vote of the voters of the District because a majority vote could fairly be said to represent official policy.

On the basis of the foregoing rulings the case was remanded and further proceedings consisting of a two day non-jury trial were held. I find and rule as follows.

## LIABILITY

Plaintiff Heritage Homes is a corporation engaged in the business of real estate development. Its president and sole shareholder is Roger DesVergnes. At some time prior to February, 1976 Heritage Homes became interested in developing approximately 150 acres of land in Seekonk, Massachusetts known as Pritchard Farm. Although plaintiff envisioned the ultimate development and sale of about 145 lots, the development and sale of only 30 homes would make the land purchase economically feasible.

I find that the plaintiff's acreage abutted the Seekonk Water District and that in February, 1976 prior to the purchase of the property Roger DesVergnes went to the Water District office and met with the District's Superintendent Roger Wilbur. DesVergnes later had a second meeting with Wilbur and several water commissioners. At both meetings the possibility of including plaintiff's land in the Seekonk Water District was discussed. DesVergnes was advised that Heritage Homes could not apply for inclusion in the District until it purchased the property but that there was no water shortage and that the District had hoped to extend the main water line in the direction of the Pritchard Farm as part of its normal expansion.

In April, 1976 plaintiff purchased the property for three hundred thousand dollars. It paid fifty thousand dollars in cash and financed the balance with a purchase money mortgage from the Taunton Cooperative Bank. The land included eight house lots on Miller Street for which no Planning Board approval was required under the subdivision control law.

On the other side of Miller Street there was a subdivision known as Fieldwood Estates which at that time contained one hundred houses and now contains between one hundred twenty–five and one hundred fifty homes. Fieldwood Estates was in the Water District.

Shortly after the purchase Roger DesVergnes returned to the water district office to apply for inclusion of plaintiff's land in the Water District. At that time he discussed with the Superintendent the appropriate method of extending the main water line and the distribution of costs incident to that extension. The Superintendent stated that the extension would benefit the District, improve water pressure in the Fieldwood Estates development and reduce taxes. DesVergnes was also informed that inclusion in the Water District was not necessary for seven of the lots on Miller Street upon which Heritage Homes intended to build because as to those lots plaintiff would be allowed to tap into the existing main just as three other houses on the same side of Miller Street had done.

On May 1, 1976 percolation tests were performed on thirty of plaintiff's street lots. Present on the property that day were the Seekonk Building Inspector, two Seekonk Selectmen and the real estate broker who had an exclusive sales contract for the proposed development. One of the two selectmen was present because he had received phone calls from members of the community expressing concern that Heritage Homes intended to build low income housing on the property or concern that HUD financing would be available to purchase the proposed houses. The callers were afraid that a lower class of people or undesirable people would be attracted to Seekonk as a result of the project.

Mr. DesVergnes took the two selectmen to North Attleboro to show them a development of homes identical to those planned for the Seekonk acreage. The selectmen told him that they did not want Heritage Homes to continue with its Seekonk project because it would attract blacks and Puerto Ricans from East Providence to Seekonk.

Between May 1 and May 11, 1976, the Building Inspector received nine or ten telephone calls from people he knew to be residents of Fieldwood Estates in which he was informed of a rumor that plaintiff planned to build HUD housing for low income families and that such a development would attract blacks and Hispanics to Seekonk. The callers asked what the Building Inspector planned to do to slow down the development.

At the same time Roger DesVergnes began getting threatening phone calls in which he received warnings not to continue with the development and threats that it would be burned down.

On May 11, 1976 a water district meeting was held. Included on the agenda for the meeting was Article 17, a motion to include the property of Heritage Homes in the Water District, and Article 18, a motion to include another 125 acres of land, owned by the Monterey Corporation, in the District. The Monterey Corporation land was destined for the development of homes in the $45,000 to $49,000 price range compared to the $33,900 price projected by Heritage Homes.

The meeting was attended by a larger crowd than usual with eighty to eighty-five Water District members present. When Roger DesVergnes arrived with his brother they sat in the last row of seats. From there they were able to overhear various conversations in which the voters were discussing among themselves the Heritage Homes project. The gist of these conversations was that the builder was planning to put in "Section 232" housing; that the project would bring in black people from nearby East Providence; that Water District members would have to sell their houses at a loss because they didn't want colored people in Seekonk; and that the subdivision must be stopped if the voters were to protect the value of their property.

When Article 17 was reached it was read aloud by water commissioner James Olean who recommended that the voters act favorably on it. He advised those present that there was enough water to service both the Heritage Homes property and the property of Monterey Corporation described in Article 18. He moved for the approval of Article 17 and his motion was seconded. The floor discussion of Article 17 lasted twenty-five to thirty minutes with a number of voters speaking against it and none

in favor of it. It became apparent that many had attended the meeting for the sole purpose of defeating Article 17. One speaker said that he understood that the houses proposed by Heritage Homes would bring black people to the area. Another man asked where the builder was. When DesVergnes understandably hesitated to identify himself the man demanded to see the builder who planned "to put up this low income housing in this town." DesVergnes then stood up but when he was asked by the same voter "What kind of shacks are you going to build in this town?" DesVergnes lost his temper and responded that it was none of the questioner's business. DesVergnes then left the meeting. The voters defeated Article 17 by a vote of sixty–six to eight.

According to District records no one else has ever been denied inclusion in the Water District in its thirty–two year history. The Superintendent testified that voter acceptance would have benefitted the voters economically. The water commissioners who testified could not explain why Article 17 was voted down.

Immediately after the defeat of Article 17, forty–three voters left the meeting. Those who remained approved Article 18 to expand the District so as to include therein the land of Monterey Corporation.

After leaving the Water District meeting the DesVergnes brothers were scheduled to appear before the Seekonk planning board in a routine building permit application. Quite a few people arrived before them and asked many questions about the Heritage Homes project. As a result the Planning Board had some difficulty keeping the meeting in order. When the DesVergnes brothers arrived they were followed by a large group of people many of whom had come directly from the Water District meeting. The meeting hall was not big enough to hold the crowd.

Jean Nelson, owner of the Monterey Corporation, testified that there was a group of Fieldwood residents at the meeting who were members of an organized neighborhood telephone network designed to "get out the vote" on certain issues. She testified that one woman appeared to be leading that group. People in the rear of the hall were overheard to say "We stopped him at the Water District and we'll stop him here." A woman who did not recognize Roger DesVergnes and his brother told them "if we don't stop this thing here tonight . . you will have all the niggers in town." Those attending the meeting were informed by the Chairman of the Planning Board that approval of the application was a routine Planning Board procedure.

At some point after May 11, 1976 the Planning Board issued the building permits. Because it had been denied inclusion in the Water District Heritage Homes proceeded to construct only the seven houses on Miller Street for which it had been advised that inclusion in the District was unnecessary because the existing main could be tapped. Construction of five of the seven houses was financed with loans from the Taunton Cooperative Bank. The other two were built with Heritage's own funds. Within three to four weeks Heritage had the seven houses completely framed. Five of them had been completed through the plastering stage. Two were closed, roof–tight, plumbing in and ready for plastering. Money had been drawn out on the five construction loans and Heritage's own funds had been put into the other two houses.

At about that time DesVergnes learned that Heritage Homes would not be allowed to tap the existing water lines and that the promised water would not be available. Superintendent Wilbur told him that a mistake had been made and that the seven houses could not have water unless they were within the District although three other houses on the same side of Miller Street as those houses and not within the District had been allowed to tap the same existing main. Heritage had already found buyers for all seven of the houses.

Heritage Homes made four subsequent applications for inclusion in the water district. The first three were denied and it was refused a hearing on the fourth. After the third denial in December, 1976 Heritage

Homes investigated alternative sources of water. It hired a consultant to investigate the possibility of digging one artesian well to service a number of homes. By the spring of 1978 after three test holes had been drilled it was determined that the water supply was inadequate to accommodate such a well. Heritage finally hired a well driller to drill individual wells for each lot.

However, while standing unoccupied for two years, the seven houses had been severely vandalized. As soon as the wells were drilled, Heritage repaired the damage and the seven houses were sold. Altogether Heritage Homes has built and sold thirty houses on the street frontage portion of its property.

 I find based on *overwhelming* evidence that the Water District's refusal to include plaintiff's land within its boundaries was motivated solely by racial considerations. In making this finding I am particularly mindful that in the thirty–two year history of the District no other applicant ever has been refused admission and that all the factors usually considered important in making such a determination favored a decision opposite to the one reached by the water district.

### DAMAGES

During the two year delay in construction and sales which resulted from the racially discriminatory acts of the Seekonk Water District, plaintiff claims that it suffered damages of $169,325.70 as follows:

| | |
|---|---|
| Vandalism | $ 14,000.00 |
| Interest on construction loans | 17,095.31 |
| Real estate taxes on lots | 4,366.51 |
| Real estate taxes on land | 14,573.87 |
| Interest on land loan | 47,124.57 |
| Installing wells | 72,165.44 |
| Total: | $169,325.70 |

 I rule that the $47,124.57 in interest paid on plaintiff's land loan should be ex-

cluded and that the amount should be further reduced by $28,475.00 which is the amount that Heritage Homes would have paid to supply the thirty houses with water if they had been rightfully included in the Water District.[1] The amount should be further reduced by that portion of the real estate taxes which is attributable to the undeveloped acreage that plaintiff still owns.

On the basis of the foregoing I find that the additional cost to plaintiff which resulted from the wrongful acts of the Water District was actually less than $100,000. I further find that by upping the sale price of the thirty houses from the original price of $33,900.00, plaintiff's receipts from its total sales have been increased by $248,840.00.[2]

 Clearly therefore even if inflationary factors were to be considered, plaintiff has effectively passed its losses on to the buyers of its homes.

However such a distribution of losses should not result in a windfall to the Seekonk Water District. In order to discourage the obviously racially discriminatory policy of that district and as a warning to others, I therefore rule that the Seekonk Water District should pay $100,000.00 in punitive damages to the plaintiff.

I further rule that the District must extend its boundaries to include Heritage Homes property in the event that Heritage Homes or its successors should decide to continue its development in accordance with the zoning bylaws currently in effect. Heritage Homes is to file such an application within 30 days of the date of this opinion and if it does so, the District must expand its boundaries within 90 days from its receipt of such a request in writing from Heritage Homes.

1. Roger DesVergnes testified that if included in the district it would have cost only $125,000 to provide the seven houses on Miller Street with water and $1,200.00 for each of the other lots.

2. Roger DesVergnes testified that plaintiff's sales total $1,265,840.00 while total sales at the original price would have been $1,017,000.00.