In re Frank J. MALONE, Debtor.

Frank J. MALONE and Joann Malone, his wife, et al., Plaintiffs,

v.

CITY OF FENTON, MISSOURI, A Municipal Corporation, Defendant.

No. 83 MISC 44B(1).
Adv. No. 82–0675(2).
Bankruptcy No. 82–1236(2).

United States District Court,
E.D. Missouri, E.D.

Aug. 28, 1984.

Glennon T. Moran and Joseph B. Dickerson, Jr., St. Louis, Mo., G. William Weier and C. Alan Schoene, Crystal City, Mo., for plaintiffs.

Thomas M. Utterback, Eugene K. Buckley, St. Louis, Mo., for defendant.

## MEMORANDUM

NANGLE, Chief Judge.

Plaintiffs brought this housing discrimination action seeking declaratory, injunctive and compensatory relief. This action was originally filed as an adversary action in the Bankruptcy Court for this district and was subsequently transferred to this Court for trial. Plaintiff Malone and his wife had previously filed for relief under Chapter 11 of the Bankruptcy Reform Act, 11 U.S.C. §§ 1101 *et seq.*, to stop foreclosure on the Malone's property in Fenton, Missouri. The property is the site of the proposed "Westview Heights Apartment Complex" (hereinafter "Westview Heights"). The Malones also sought to stop foreclosure on their home on which there was a second deed of trust as security on the loan on the Westview Heights project. Plaintiffs, who include the Malones, other investors in the Westview Heights project, and an intervenor-plaintiff named Charles Bryson, Jr., allege that the conduct of defendant city, in refusing to zone the Malone property "G–1" multiple family so that the Westview Heights Apartment Complex could be built, violated the fourteenth amendment to the Constitution, *U.S. Const. amend. XIV,* §§ 3604(a)

and 3617 of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and §§ 1981, 1982 and 1983 of the Civil Rights Acts of 1866, 42 U.S.C. §§ 1981, 1982, 1983.

This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. *Fed.R.Civ.P.* 52.

## A. FINDINGS OF FACT

1. The real estate subject of this action (hereinafter "Malone tract") at all applicable times was located within the limits of the City of Fenton, Missouri, at the southwest corner of Horan Drive and Larkin Williams Industrial Court. The City of Fenton, defendant in this action, is a municipality located in the southwest portion of St. Louis County, Missouri.

2. The Malone tract is composed of approximately 4.32 acres and was zoned "A" Small Farm under the City of Fenton's zoning code until approximately November of 1972. The Malone tract, which was then owned by Edith Dunlap, was zoned "G–1 Multiple Family" by the passage of Ordinance No. 335. Ordinance No. 335 was passed at the November 20, 1972, meeting of the Board of Aldermen of the City of Fenton by a five (5) to four (4) vote.

3. Ordinance No. 335 provided, *inter alia:*

> [T]he City of Fenton is desirous, in this particular instance, to provide a proper and appropriate buffer between industrial, commercial and residential areas herein, and being of the opinion that the proposed planned multiple district will provide a proper and appropriate buffer for the purpose and intent herein expressed....

Ord. No. 335, "Whereas" cl. 6. Section 2 of Ordinance No. 335 established a deadline for the filing of a preliminary plat, a final plat, and for the completion of the first building as well as all streets, sewers, water lines and other improvements, but gave the Board of Aldermen the power to extend said deadlines for good cause shown. Section 10 of Ordinance No. 335 provided, as follows:

> This ordinance shall be in full force and effect from and after the date of its passage and approval; provided however, that the owner and developer, within thirty days after the date of adoption and approval, file with the City Clerk an acceptance in writing of all of the provisions of this ordinance; and provided further that if such acceptance be not so filed within said period of thirty days, all rights, privileges, and authority herein granted shall become null and void.

Ord. No. 335, § 10. Section 11 of Ordinance 335 provided, as follows:

> Sections 1 through 10, inclusive, of this ordinance are conditions precedent to the passage of this ordinance and failure to comply fully with any of such sections of this ordinance, unless expressly relieved from the terms thereof by a subsequent ordinance or by order of the Board of Aldermen, shall make this ordinance null and void, the rezoning herein contemplated shall not have taken place and the property herein described shall continue to be zoned as "A" Small Farm District.

Ord. No. 335, § 11.

In addition, § 9 provided that the development of the Malone tract was "expressly subject to the applicable terms and provisions of," *inter alia*, Ordinance No. 171. Ord. No. 335, § 9. Ordinance No. 171 established the requirements for "G–1" planned multi-family districts and contained a "reverter" clause. Said reverter clause in Ordinance No. 171 provided that if substantial work or construction did not commence within one (1) year from the date of the "G–1" zoning, the subject property reverted to its former zoning classification and the change to "G–1" was to be treated as null and void. Ordinance No. 171 further stated that if apartments were not constructed within three (3) years after the "G–1" zoning was granted, the proper-

ty or portions thereof uncompleted was considered to have the same zoning classification existing prior to the "G-1" zoning.[1]

There was no evidence that the owner and developer of the Malone tract filed a written acceptance of the terms of Ordinance No. 335 within thirty (30) days after passage of said ordinance. No development of any type, substantial or otherwise, has occurred on the subject property from the passage of Ordinance No. 335 to the present.

4. Nevertheless, on July 15, 1974, pursuant to a letter from then Malone tract owner Jerome Howe, the Board of Aldermen granted an eighteen (18) month extension on the "G-1 Multiple Family" zoning status of the Malone tract. This was allowed to expire, but on May 19, 1976, and again pursuant to a letter from owner and developer Jerome Howe, the Board of Aldermen granted another eighteen (18) month extension of the multiple family zoning on the Malone tract. This second extension was also allowed to expire and no further significant action took place with respect to the Malone tract until September 6, 1978, when a petition for change of zoning was presented to the Planning and Zoning Commission (hereinafter "Commission") of the City of Fenton.[2] Neither of the two (2) extensions referred to in this paragraph purported to expressly relieve the owner of the Malone tract of the terms and conditions of Ordinance No. 335.

5. On March 19, 1979, the Board of Aldermen granted a nine (9) month extension of the "G-1" multiple family zoning status of the Malone tract, and on July 16, 1979, it similarly granted a six (6) month extension. Neither of these two (2) extensions purported to expressly relieve the owner of the Malone tract of the terms and conditions of Ordinance No. 335. The last extension expired on January 16, 1980, but on February 18, 1980, the Board of Aldermen approved the final plat for the Westview Heights project on the Malone tract. Then, on April 21, 1980, the Board of Aldermen granted a one (1) year extension of the "G-1" zoning status of the Malone tract. On May 19, 1980, the Board of Aldermen again approved the final plat for Westview Heights, which included new storm water drainage and sewer stipulations.

6. Mr. Frank J. Malone and his wife Joann initiated their purchase of the Malone tract in May of 1980 and they received a General Warranty Deed to said property from then owner L. Aboussie on July 8, 1980. The Malones intended to develop the tract as Westview Heights in accordance with the plans of Aboussie, subject to minor modifications. When they bought the property the Malones believed that it was legally zoned "G-1" multiple family.

7. During the Summer of 1980 Mr. Malone submitted his construction documents and plans to the City of Fenton. On August 7, 1980, Mr. Melvin West, Building Commissioner of the City of Fenton,

---

**1.** At trial and in their briefs plaintiffs made much of the facts that Ordinance No. 171 was replaced in January of 1980 by Ordinance No. 512 and that the terms of the reverter clause therein, § 14J.(5), are different from the reverter clause in Ordinance No. 171. The only difference between the two (2) clauses, however, is that the one (1) year condition in Ordinance No. 512 requires "appropriate action" by the Board of Aldermen for a reversion to occur due to failure of the one (1) year condition, whereas reversion upon failure of the one (1) year condition in Ordinance No. 171 was automatic. This distinction is not material because failure of the three (3) year condition in *both* Ordinances No. 512 and No. 171 results in automatic reversion. Moreover, Ordinance No. 171 was in effect and applicable during the first seven (7) years fol-

lowing the passage of Ordinance No. 335, which purported to rezone the Malone tract to "G-1" multiple family.

**2.** In the City of Fenton there is both a Planning and Zoning Commission and a Planning and Zoning Committee. The Committee consists of three (3) aldermen, whereas the Commission apparently consists of ten (10) individuals who are either appointed or elected for staggered terms. The precise delineation of functions between the two (2) bodies was not made clear at trial, but this does not bear on a material issue. As between the two (2) bodies, the Commission, which holds hearings on zoning requests and makes recommendations to the Board of Aldermen, played a more significant role in the factual scenario of this case.

stamped the construction plans for Westview Heights as "approved for zoning" and executed those plans on behalf of the City of Fenton. The plans for the project were then forwarded to the St. Louis County Department of Public Works for further review.

Mr. Malone, however, did not have financing for his project during the Summer of 1980. Simultaneous to his negotiations for the purchase of the Malone tract, Mr. Malone applied to the Department of Housing and Urban Development (hereinafter "HUD") of the United States for construction financing. Mr. Malone received a Firm Commitment of financing from HUD and the Government National Mortgage Association in January, 1981, which commitment was renewed in December, 1981.

8. Mr. Malone wrote a letter to the Board of Aldermen, dated May 7, 1981, advising the Board that he had applied for HUD financing. However, the existence of HUD financing and the likelihood of so-called "Section 8 housing" being a part of Westview Heights was known to both Mayor Joseph Morgan and the City of Fenton prior to May 7, 1981. Mayor Morgan testified that both he and the city were aware, as early as 1979, that Westview Heights would be financed by HUD and would contain a certain number of subsidized § 8 units, because Aboussie so informed them when he appeared before the Board of Aldermen in 1979. Moreover, on August 5, 1980, Mr. John Bullock, a representative of HUD, wrote a letter to the Mayor relating to HUD financing of the Malone tract. Mayor Morgan responded in a letter dated September 15, 1980, that the city did not object to the development "either conceptually or in fact." However, in the same letter, Mayor Morgan expressed reservations about the ability of the Riverside Sewer Company to adequately service a 75-unit apartment project and about the availability of public transportation for elderly residents of the project.

9. With the most recent extension of the "G–1" zoning about to expire on May 21, 1981, Mr. Malone requested another extension, to April 20, 1982, by letter at the May 18, 1981, meeting of the Board of Aldermen. This request was not acted upon but was held before the Planning and Zoning Committee because the letter was not received soon enough to bring it before the Board.

At the June 15, 1981, meeting of the Board of Aldermen, Mr. Malone's request for an extension of "G–1" zoning was, according to the Board's minutes, "tabled until we can gain more information on the type of financing that would be available."

Mr. Malone's request next came up at the July 20, 1981, meeting of the Board of Aldermen. At that meeting a motion was made to grant an extension of "G–1" zoning on the Malone tract until April 20, 1982, provided that building permits would not issue "until it can be demonstrated that adequate drainage capacity of sanitary sewers exists during wet weather flow." In addition, a second motion was made to require Mr. Malone to furnish the city with data concerning the capacity of the sewer system "during wet weather flow and dry weather flow." The second motion was unanimously adopted by a vote of 8–0. However, the first motion resulted in a tied vote of 4–4. The tie was broken by Mayor Morgan who voted against the first motion, thus denying the request for an extension. Mr. Malone explained to the Board, in an unsuccessful effort to get the Board to reconsider its action, that the reason for the delay in his development of the tract was the lack of financing.

At the same July 20, 1981, meeting, a motion was made to rezone the property "A" Non-Urban (Farm) and then send the matter back to the Planning and Zoning Committee. This motion passed by a vote of 7–1.

10. The matter of zoning on the Malone tract was next taken up by the Planning and Zoning Commission at its regular meeting on October 7, 1981. Mr. Malone and his attorney, Mr. Euston, attended the meeting and requested the Commission to postpone its consideration of the matter of the zoning change of the Malone tract from

"G–1" multiple family to "A" non-urban district. According to the minutes of the October 7, 1981, meeting, Mr. Euston stated that:

> since the "G–1" zoning was issued nine years ago, and since they are having to make financial arrangements, the postponement should be granted.... If the City does not feel the Multi-Family zoning is correct for this parcel of land, they can come back with an alternate plan. But his clients need time to come up with an alternative plan.... There is nothing firm in the works at the present time.... [T]hey still plan to go with the Multi-Family zoning.... They are willing to bring in commercial if the Multi-Family is not approved. They are only asking for a postponement of any decision at this time. His clients have an option with another parcel of property in the City of Fenton.

Mr. Malone then indicated that he would need until January 1, 1982, to transfer the HUD paperwork from the Malone tract to an alternative site. In addition, Mr. Malone stated, as follows:

> They are not disagreeing with the City that perhaps this property [the Malone tract] is not zoned correctly. He believes they have found the right type of property, .... They would like the time to find an alternative spot before the City rezones this property.

The Planning and Zoning Commission granted Mr. Malone's request for a continuance.

At the November 4, 1981, meeting of the Planning and Zoning Commission, Chairman Ray Nathe acknowledged receiving a letter from Mr. Malone, dated October 28, 1981, requesting that the Malone tract be rezoned "J–1" industrial. The Commission again postponed action on the proposal to rezone the Malone tract to "A" non-urban. It took no action on Mr. Malone's request that the Malone tract be rezoned industrial because separate notice and a public hearing was required.

At the January 6, 1982, meeting of the Planning and Zoning Commission, Mr. Malone again stated that he had an alternate site for multiple family housing and that the Malone tract should be zoned industrial. Because he had not yet received approval from HUD for the alternate site, he sought another continuance of the rezoning question. His request for a continuance was denied this time. A motion was made to recommend to the Board of Aldermen that the Malone tract be zoned "A–1" non-urban and said motion passed.

11. At the January 18, 1982, regular meeting of the Board of Aldermen the question of rezoning the Malone tract was addressed. An ordinance was presented to rezone the property to "A" non-urban. However, Thomas Utterback, City Attorney for Fenton, stated that in his opinion the property had reverted to "A" non-urban over nine (9) years ago, under Ordinance No. 171, and that the continuances over the years had been illegal. In addition, Mr. Utterback recommended that Mr. Malone go back to the Planning and Zoning Commission and initiate a new zoning petition.

Elmer Smith, a representative of HUD was present at the meeting and explained the financing element of Westview Heights. The following exchange, according to the Board's minutes, took place:

> Alderman Harris asked, "What is [sic] amount of income that would qualify a person to live there?" His answer was that rental is $375 a month plus utilities. Eighty percent of apartments are reserved for the people who can afford to pay. Twenty percent of [sic] project must be allotted for lower income. People pay 25% of their income for rent. Alderman Dougherty asked, "Can 80% figure be changed?" Mr. Smith answered negatively.

12. On January 19, 1982, Mr. Malone filed a "Petition For Change of Zoning" with the City of Fenton to get the Malone tract zoned "G–1" multiple family.

13. At the February 10, 1982, meeting of the Planning and Zoning Commission, a public hearing was held on Mr. Malone's

petition. Mr. Utterback explained, apparently referring to Ordinance No. 171, that such a procedure was necessary because the property had reverted to "A" non-urban nine (9) years earlier when apartments were not built on the tract within three (3) years after November 20, 1972. Mr. Malone then presented his petition. He stated that the City of Fenton had made an unintentional mistake, apparently in illegally granting extensions on the "G–1" status, which needed to be corrected. He also stated that he had financing for Westview Heights and was ready to proceed if approval was granted. Mr. Malone and his associates then presented a detailed description of the project.

The site is at the bottom of a large hill. Westview Heights would consist of seventy-six (76) units and a laundry area. One (1) unit would be used by the full-time manager. Seventy-two (72) units would be normal, two (2) bedroom apartments. Three (3) units would be two (2) bedroom apartments equipped for handicapped tenants. There would be one hundred fifty (150) parking spaces or two (2) per unit. Mr. Malone indicated that tenants would most likely consist of retired persons, city employees, young married couples, and divorced people with children.

Both Chairman Nathe and Mr. Utterback expressed concern about the capacity of the sewer system with the addition of Westview Heights. Mr. Utterback explained that Riverside Sewer Company (hereinafter "RSD"), a private concern, had operated the sewer system until November of 1981, when the Metropolitan Sewer District (hereinafter "MSD") took over RSD due to operating problems. At the time of the meeting RSD was in Chapter 11 of the Bankruptcy Code. MSD had agreed to operate RSD for only six (6) months and there was no certainty that that operation would continue. Mr. Malone and his associates agreed to provide the City with additional information on the sewer situation.

Mr. Malone stated that he had considered two (2) other sites but "they would have cost too much to develop, were difficult to reach and involved sewer problems." He also reminded the Commission that under the HUD financing he had until June 1, 1982, to begin construction.

Several of those in attendance discussed how the citizens of the City of Fenton felt about the project. A former Alderman and a plaintiff herein, Mrs. Jean Gerber, stated that the people were not in favor of industrial expansion and that the site was originally intended to be a buffer zone. On the other hand, Alderman Frances Pickles, who indicated that she had called several constituents, stated, as follows:

> The concept of that area being a buffer zone is not true since Horan [Drive] was rezoned. Buffer is obsolete today. We do need prime office building property in the City.

Finally, Chairman Nathe stated that he opposed the project because of the increased traffic and his belief that the City should support its commercial areas.

A motion was made that the Commission recommend to the Board of Aldermen that Mr. Malone's petition be denied. Said motion passed by a vote of 7 to 0.

14. Mr. Malone's petition to rezone the Malone tract to "G–1" multiple family came before the Board of Aldermen at its regular meeting on March 15, 1982.

Mr. Jerome Wallach spoke first in opposition to an anonymous letter that had been circulated during the prior weekend with respect to Westview Heights. The letter notified readers of the March 15, 1982, meeting and asked its readers to voice opposition to Westview Heights in person or through their alderman. The author of the letter opposed subsidized housing as a matter of principle and predicted the following scenario: 1) no one would be willing to pay the market rate rents of $375.00/month to live "in the middle of an industrial park" that was not near shopping centers; 2) due to insufficient revenues the project would be foreclosed on by HUD, which would open the project to 100% subsidization; and 3) crime would go up and property values would go down.

At one point the author stated: "remember Pruitt-Igoe?" [3] The letter closed with the following comments:

This is not a racial issue!!! The issues are fiscal irresponsibility of the federal gov't, and the encouragement (by subsidation [sic]) of individual irresponsibility. Responsibility is an individual issue; I do not care to be victimized by anyone, regardless where his ancestors came from!

According to the minutes, Mr. Wallach's response to the letter was, as follows:

Site [the Malone tract] was selected to buffer industrial area to north and residential area to the south .... Applicant would be carefully screened. Fifteen units will be rent subsidized by the amount of $125 a month. People would have to be able to pay $250 a month. In order to qualify for this rent subsidy, they must have an income of $16,000 for a couple and $20,700 income for a family of four.

Thousands of people drive to Fenton to work and then drive out to go home. Many are white collar type workers and that is the class of people which would be attracted to housing of this sort. Mr. Wallach asked people to reread the letter in light of simple logic.

The Board then considered and discussed Bill No. 82–14, which was the bill to rezone the Malone tract to "G–1" multiple family housing.[4] Concerning its location and land use, Alderman Pickles:

explained that this piece of property is locked in by industrial areas on three sides. Eighty percent of property is on industrial court in Fenton. Twenty percent is on an industrial through street .... If children, elderly people and industrial traffic are put together, it will be a problem. Highest and best use of

the property is industrial. There is no way it should be residential.

Other aldermen indicated the nature of feedback they had received from constituents, i.e., for or against. A vote was taken and Bill No. 82–14 passed by a vote of 6–4. Bill No. 82–14 became Ordinance No. 574 and the Malone tract was thus rezoned "G–1" multiple family.

15. On March 30, 1982, however, Mayor Joseph Morgan vetoed Ordinance No. 574 at a special meeting of the Board of Aldermen. His veto was accompanied by a statement of reasons. The major reason for his veto was his belief that the use of the Malone tract as a "buffer zone" had become obsolete:

As you will note, substantial and quality industrial development has occurred on tracts that surround the subject site. The original concerns regarding the need for a buffer zone of some nine and one-half years ago no longer is valid. In my view, the proper use of this tract is industrial. I say this not only on the basis of the present development of the area but the future development as well.

To support his belief about land use, Mayor Morgan relied on two (2) documents.

The first was a historical analysis of land use development in the City of Fenton, prepared by Mel West on March 22, 1982, at the request of Mayor Morgan. Mr. West's report recounts the development of industrial parks in the northeast quadrant of the City of Fenton. He stated that through controlled industrial development "[t]he need for a 'buffer' no longer exists." Specifically, he pointed out that the city has required construction with quality materials and a minimum fifty (50) foot setback from the street to provide a landscaped area. As to the undesirability of multiple family housing on the Malone

---

3. This Court takes judicial notice of the fact that "Pruitt-Igoe" was the name for a large subsidized, high rise housing project built in the City of St. Louis in 1954 and razed in the mid-1970's. The project consisted almost entirely of poor minorities and was a high-crime area. It became a symbol of failure of that type of housing project.

4. Prior to this, a considerable amount of discussion took place concerning allegations that Mr. Malone had taken certain City of Fenton papers and correspondence from the desk of Mel West, Building Commissioner. Mr. Malone more or less admitted the truth of the allegations and apologized. The incident seems not to have had any further significance.

tract, Mr. West pointed out that it is surrounded by industrial development, is not near retail shops, does not have public transportation, and is not near recreational or emergency facilities.

The second document that Mayor Morgan relied on was the St. Louis County Economic Development Report of January, 1982. The report indicated that Fenton had a substantial share of the best quality industrial land in the County. County Executive Gene McNary urged cooperation in continuing industrial development in the County so that economic growth could occur and jobs could be created.

In addition, the Mayor justified his veto on the ground of his concern about sewer capacities under RSD, which would service Westview Heights. He stated that until MSD acquires and operates this system "there is no assurance that capacities can be developed to handle present zoning." The Mayor suggested that until the RSD situation was resolved he would "not take any chance with the health and safety of residents in that area."

The Mayor concluded his veto message, as follows:

I would point out that our "G–1" zoning classification was established and written so that review of the zoning would occur if development did not occur within that time frame and it is quite clear that circumstances have drastically changed from that zoning some nine and one-half years ago.

16. At the March 30, 1982, Special Meeting of the Board of Aldermen, an attempt to override Mayor Morgan's veto failed.

17. On August 16, 1982, the Malone tract, together with the 4.47 acres adjoining it on the west side, were rezoned "J–1" planned industrial district by passage of Ordinance No. 598.

18. The City of Fenton is a major industrial area in the County of St. Louis. It possesses 10% of the prime industrial land in St. Louis County. The Malone tract itself possesses the same characteristics as the prime industrial land located near the Malone tract. Substantially developed industrial parks touch the Malone tract on two sides. To the north is the Executive Industrial Park. Executive Industrial Park is located on the north side of Horan Drive, begins near the Malone tract, and extends westward to Bowles Avenue for an approximate distance of 1.5 miles from the Malone tract. Among the businesses located there, including dates of inception, are the following: 1) Denny's (1977); 2) Drury's Inn (1976); 3) International Harvester (1977); 4) Rite Point Pencil Offices and Factories (1976); 5) Rug Doctor (1979); 6) M.T. Investments (1979); 7) Aetna Cable Co. (1979); Soccer World West (1983); Ashinger Electric Co. (1981); Becker's, Inc. (1983); Wolff Shoe Co. (1982). Other uses of the land in the Executive Industrial Park include office and warehouse buildings. On the east side of the Malone tract is the Larkin Williams Industrial Park. Among the businesses located there, including dates of inception and types of business, are as follows: 1) Footwear Unlimited (1980-major shoe distribution center); 2) Smith-Treanor (1978-multi-tenant office and warehouse building); 3) Evergreen Lawn Corporation (1976-supplier of lawn growth materials); 4) Hytrol Conveyor Co., Inc. (1972-worldwide distributor of packaged conveyor materials); 5) Multiplex Display Fixture (1978-supplier of home furnishings display fixtures); 6) Ocello Tool and Die Co. (1978); 7) Medart Engines and Parts (1979-major area supplier of engine parts); 8) Vivian of St. Louis, Inc. (1979-producer of ice crushing machines). In addition, the parcels of land directly to the south and west of the Malone tract are zoned "J–1" planned industrial district. The Malone tract is thus completely surrounded by land that is either being used industrially or is zoned for future industrial development. Furthermore, many of the industrial park users initiated their use in the late 1970's or early 1980's.

Located south of Horan Drive and east of Bowles Avenue is a large section of single-family, residential homes. This residential tract is directly across Horan Drive

from the Executive Industrial Park. On the eastern border of this residential tract, running along the full north-south length of said tract, and west of the industrially zoned tracts that are west of the Malone tract, is a large tract of public/quasi-public land owned by U.A.W. Local 136. This tract is used as a labor union hall and recreation area.

In addition, on the eastern side of Larkin Williams Road, across from the Executive Industrial Park and the Larkin Williams Industrial Park, are three (3) other industrial parks: 1) Rudder Industrial Park; 2) Fencom; and 3) Fenpark. Most of the firms in these parks have been there since the later 1960's and early 1970's. To the east of these parks are Weiss Airport, I–44 Industrial Park, the United Van Lines tract, and the Fabick Caterpillar tract.

In sum, the City of Fenton's land uses generally consist of industrial uses in the north and east portions of the city and single-family residential uses in the south and west portions of the city.

19. The most appropriate, highest and best use of the Malone tract is industrial. Although the city fathers of Fenton, in the late 1960's and early 1970's, envisioned the Malone tract as being a buffer between the residential uses to the west and the industrial uses to the east, subsequent developments in the late 1970's and early 1980's rendered the buffer concept for the Malone tract obsolete.

20. Plaintiffs Frank J. Malone and JoAnn Malone, Robert Wright, Glennon Moran, and Jean Gerber have ownership interests in the Malone tract. The Malones took on these additional partners in February, 1982. In order to reserve his loan with the Government, Mr. Malone had to pay a non-refundable deposit of approximately $72,000.00. To secure this money Mr. Malone persuaded Mr. Wright to put up $70,000.00 and Mr. Moran to put up $3,000.00. In addition, Mr. Moran and Ms. Gerber guaranteed Mr. Wright's deposit by placing second deeds of trust on their property. In exchange, Mr. Wright, Mr. Moran, and Mr. Gerber each received a 25% per-

centage interest in the Malone tract. This arrangement was committed to writing in a "Memorandum of Agreement" dated February 11, 1982. All of these plaintiffs are white, do not live within the City of Fenton and would not be residents of the proposed Westview Heights project. If the City of Fenton does not allow these plaintiffs to develop the Westview Heights project on the Malone tract, they will suffer substantial economic losses.

21. Plaintiff Charles Bryson, II, is a 24 year old black man who lives in the southern portion of St. Louis County. He lives in the Lindbergh School District and attended Lindbergh High School, from which he graduated in 1976. He testified that out of the approximately five thousand (5000) students who attend Lindbergh schools, ten (10) or twelve (12) are black and he was one (1) of only two (2) blacks in his high school graduating class. Mr. Bryson works for Urban Behavioral Research Associates, which is located in the Downtown section of St. Louis, Missouri. The Malone tract is farther from Downtown than where Mr. Bryson was living at the time of trial. However, Mr. Bryson testified that he does not go Downtown every day and travels quite a bit. He earns about $600.00/month and is single. It was not specified whether the $600.00 figure is his net or gross income. At the time of trial he was living at home.

Mr. Bryson testified that he was not sure about where he plans to live when he moves out of his parents' home, but that he would like to live in the Lindbergh School District. However, he stated that he likes the Fenton area, that it is in the Lindbergh School District, and that if Westview Heights is built it is "possible" that he would want to live there. He has never looked for an apartment in Fenton, taken any steps to move to Fenton, or even visited the site of the proposed Westview Heights project. His only knowledge of the project was what counsel for plaintiffs told him about it. Mr. Bryson's knowledge of Westview Heights was first obtained in late spring of 1983 through conversations

with Mr. Mark Moran, a friend of Mr. Bryson and son of plaintiff Glennon Moran.

22. The City of Fenton has approximately 2,400 residents and possesses an extremely large territory compared to its population. Approximately ⅔ of the community is developed industrially and the City of Fenton has a work force, or daytime population, of approximately ten (10) times its resident population or in excess of 24,000 persons. A major interstate highway, I–44, bisects the industrial area in the northern ⅔ of the community. The Chrysler Automobile Assembly Plant occupies a majority of the industrial portion of Fenton north of I–44. At the time of trial there were no black persons living within the boundaries of the City of Fenton. However, one exhibit offered into evidence indicated that four (4) black persons were living in Fenton in 1979.

23. At all times relevant herein, storm and sanitary sewers were a recurring problem for the City of Fenton. In some areas, the problem was inadequate capacity and resulted in water seepage in the basements of homes. A more serious problem was improper management by RSD. At the time of the Mayor's veto herein, sewage capacity was not inadequate for development of the Westview Heights project. However, at the same time MSD was temporarily operating the sewer system and the future management of said system was uncertain.

24. The City of Fenton opposed two (2) multiple family housing projects, prior to the Westview Heights project. In 1979, the City opposed a low to medium income apartment complex, known as "Barton Woods", which was to be located just outside the limits of the City of Fenton. The City's opposition to this project was based on a report prepared by Black and Veatch Engineers, supported by MSD, which concluded that sewage disposal was not adequate for the project. The Barton Woods project would have contained § 8 housing. The City's opposition to Barton Woods was not based, even in part, on opposition to subsidized housing or black persons.

In 1979 and 1982, the City opposed the development of a luxury condominium project in the City, known as "The Timbers," unless undersized sanitary sewers were corrected.

In addition, in 1981, the City of Fenton opposed a commercial development, located outside the City's limits but designed to use Fenton's sewers, on the basis of inadequate sewers.

None of these three (3) projects was ever developed.

25. At least two (2) alternative sites for Westview Heights existed in the City of Fenton at or near the time of the Mayor's veto. However, each of these would have required significant additional construction and expense to make it a successful development. For example, the alternative site known as the "Czapla" tract would have required improvements to the access road and bridge to make the tract accessible during periodic floods.

26. Following the Mayor's veto no property in Fenton was zoned "G–1" multiple family.

27. The City of Fenton's handling of zoning on the Malone tract was unique in three (3) respects. First, the City's refusal to grant Mr. Malone's request for an extension of the "G–1" zoning on the Malone tract in July, 1981, was the first such refusal in the City's history. Second, the City's invocation of the reverter clause in Ordinance No. 171 was the first time it had ever been invoked or used by the Board of Aldermen to change a zoning classification. Third, several former city officials testified that this was the first time that a zoning request had been denied due to sewer problems. However, the inference that these "firsts" were the result of racial discrimination or discrimination against subsidized multiple family housing is weak because the history of the Malone tract was unique. For example, the inference of discrimination would be stronger if there was evidence that the City had granted extensions or refused to exercise the reverter clause on other tracts where developers had failed

to develop the property as represented for over nine (9) years. No such evidence was produced. The inference of discrimination would also be stronger if there was evidence that the City had granted extensions or refused to exercise the reverter clause on other tracts where the original purpose of the zoning classification, i.e., the buffer concept, had become obsolete due to subsequent, intervening developments. No such evidence was produced. Finally, the inference of discrimination would be stronger if there was evidence that zoning requests, which would have increased sewer usage, had been granted even though the sewer system operator was going through bankruptcy and the sewer system was being temporarily operated by another. No such evidence was produced.

28. The Malone tract is not located in the Lindbergh School District. It is located in the Rockwood School District.

29. Dr. John E. Farley testified for plaintiffs as an expert on housing discrimination and the effect of the City's action on black persons and housing patterns in the St. Louis Metropolitan area. Dr. Farley is qualified to render opinions on these topics. His opinions, as they relate to this case, were based upon his knowledge of the proposed Westview Heights project, his review of 1980 census data, his review of studies of St. Louis housing patterns, and his search of sociological literature about the patterns and effects of racially segregated housing. However, none of the source material that Dr. Farley used to form his opinions specifically focused on or dealt with the City of Fenton. Dr. Farley did not visit Fenton or take any housing or employment surveys in Fenton. Dr. Farley did not examine housing and census data for the unincorporated areas bordering the City of Fenton. Dr. Farley did not take a survey of blacks to determine how many desire to move to Westview Heights.

The essence of Dr. Farley's expert opinion testimony was his recitation of six (6) conclusions regarding the effect on blacks of the City's denial of "G–1" multiple family zoning on the Malone tract. These conclusions about the impact of the denial on blacks were, as follows: 1) the denial contributes to the continued "exclusion" of blacks from the City of Fenton; 2) the denial contributes to the continuation of the broader pattern of racially segregated housing in St. Louis where blacks are "confined" to small or central areas; 3) blacks are subjected to certain economic costs because they must live in poorer quality housing; 4) "proportionately more" blacks than whites qualify for § 8 housing; 5) there are and will be more job opportunities for blacks in the Fenton area than in the areas where blacks presently reside, such as St. Louis City and the north St. Louis City and County area; and 6) the denial contributes to the problem of racially segregated schools in the St. Louis area and thereby denies blacks equal educational opportunities. In sum, Dr. Farley concluded that the denial has a substantially greater negative effect on blacks than on whites. Dr. Farley's analysis focused on the percentage of whites negatively affected versus the percentage of blacks negatively affected.

On cross-examination Dr. Farley stated that a factor in estimating the discriminatory effect of a given housing decision is the availability of low-income housing and that he would expect the racial composition of the Westview Heights project to substantially mirror the racial composition of surrounding areas.

30. Dr. Endsley Terrence Jones testified for defendant as an expert on the housing discrimination effects of the City's action. Dr. Jones is qualified to render opinions on this and related topics. His testimony was submitted to this Court by way of deposition. In addition, in November, 1982, Dr. Jones prepared a lengthy report for counsel for defendant. The report is entitled "Migration Trends and Race in the St. Louis Metro Area." His report is divided into five (5) parts and contains an appendix of tables, graphs, and maps illustrating the bases for his conclusions. Each part starts with a particular question, states an answer or opinion, and then dis-

cusses the information or data which supports said answer or opinion.

Part I considers these two (2) questions: 1) "What have been the migration trends, by race, in the Missouri portion of the St. Louis metropolitan area during the past twenty years?"; and 2) "Has there been a tendency for blacks to migrate primarily to northern St. Louis County and for whites to southern St. Louis County?" To answer these, Dr. Jones looked at the following data: 1) St. Louis County census counts; 2) racial migration trends as indicated by zip code information on moves within the area; 3) census tract maps of St. Louis County showing locations of the black population; 4) the percentage racial composition of the municipalities located within St. Louis County; and 5) census tract information for Fenton and surrounding areas showing the percentage of blacks residing there. His statistics reveal that 12.5% of the combined St. Louis City and County population is non-white. Dr. Jones concluded that the principal city-to-suburban migration trend in the Missouri portion of the St. Louis metropolitan area during the past twenty (20) years has been for blacks to migrate primarily to northern St. Louis County and for whites to move to southern St. Louis County.

Part II considers the following question: "If additional assisted housing were to become available in southwestern St. Louis County, what would be the likely racial characteristics of its occupants?" Dr. Jones concluded that a substantial majority of the residents of any additional assisted housing in southwestern St. Louis County would be white. He based this conclusion on three (3) significant facts. First, there are two (2) multiple family assisted housing developments in southwestern St. Louis County, near Fenton, and a majority of the population in each is white. At the Valley Apartments, 75% of the 42 units were occupied by whites in 1980. At the Hawkins Village Apartments, 84% of the 140 units were occupied by whites in 1980. Second, past holders of St. Louis County § 8 certificates have tended to select units in areas having a majority of their race. To support this fact, Dr. Jones relied on the following passage from a 1980 report on racial patterns in housing and schools in St. Louis that was prepared by Paul Fischer, a former H.U.D. official, as part of the background compilation of information for the St. Louis school desegregation case:

> In the City of St. Louis, approximately 1100 of the 2000 certificate holders, or 55 percent, are black. But of these 1100 black certificate holders, 961 or 87 percent live in ... census tracts that are over 75 percent black. Among the approximately 800 white certificate holders, 570, or 71 percent, live in areas under 40 percent black. It is also clear that most of the blacks living in white areas are elderly and vice versa. In St. Louis County about 760 or 38 percent of certificate holders are black but like the City there is a strong relationship between the race of the tenant and the racial composition of the residence area. Of the 769 [sic] black certificate holders, 649, or 85 percent, live in impacted areas, most of which are over 75 percent black. This is in contrast to the approximately 1250 white certificate holders of which about 800 or 65 percent live in mostly white areas. Once again the white certificate holders in black areas and the blacks in white areas tend to be elderly.[5]

Third, although since 1977 there has been an agreement between the City of St. Louis Housing Authority and the Housing Authority of St. Louis County to honor § 8 certificates issued by the other jurisdiction, § 8 certificate holders in St. Louis City have not made much use of their ability to live in St. Louis County.[6]

---

**5.** Oddly enough, this passage was the *only* evidence offered at trial concerning the number and racial composition of those possessing § 8 certificates, which are, of course, necessary to obtain § 8 rent subsidies.

**6.** Dr. Jones cited the statistic that from 1977 through 1980 only 126, or 6%, of St. Louis City § 8 certificate holders chose to live in St. Louis County and none of these chose to live in or near Fenton.

Part III of Dr. Jones' report answered the following questions: "What is the supply of low and moderate income rental housing in southwestern St. Louis County and what is the racial mix in that housing?" To answer these questions, Dr. Jones analyzed block level data, for blocks with rental units, from the 1980 census for the census tracts including and bordering the City of Fenton. In these blocks there was a total of 2,222 rental units. Of these, 18% rented for less than $150 per month and 75% rented for less than $250 per month. In addition, Dr. Jones estimated the percentages of black families who could afford these two (2) rental rates. He concluded that 68% of St. Louis City black families, 86% of St. Louis County black families, and 74.7% of the combined City-County black families could afford $150 per month for rent. He concluded that 48.4% of St. Louis City black families, 72.9% of St. Louis County black families, and 57.3% of combined City-County black families could afford $250 per month for rent.

Part IV of Dr. Jones' report considered the following question: "What does social science tell us about the degree of and causes for residential segregation in metropolitan areas in the United States?" Dr. Jones answered this question by thoroughly reviewing the scholarly literature. He concluded that most U.S. metropolitan areas have a high degree of residential segregation. He concluded that until the late 1960's government action or inaction, such as enforcement of restrictive covenants and the absence of fair housing laws, was a major contributor to maintaining residential segregation. Dr. Jones' report indicated that scholars believe that developments subsequent to 1965 should have decreased residential segregation and that they believe the following factors have helped to maintain such segregation:

(a) few blacks wish to be the first entrants into an all-white neighborhood;

(b) some blacks opt for voluntary self-segregation to express their cultural sep-

aratism and to maintain their political base;

(c) blacks wish to maintain close access to their friends and relatives, most of whom live in segregated neighborhoods;

(d) low-income blacks require ready access to public transportation and other government assistance (e.g., health clinics, social service offices) which are often not available in white suburban areas;

(e) both races rely most heavily on the advice of friends and relatives when they search for new housing and, since these friends and relatives typically are of the same race and live in segregated areas, the search communication process helps maintain already established segregated residential patterns; and

(f) non-governmental groups (e.g., landlords and realtors) sometimes engage in subtle discriminatory practices.

Part IV at 2.

Part V posed the following question: "What has been the reaction of the St. Louis black community to programs designed to relocate inner-city low-income blacks to suburban white neighborhoods?" Dr. Jones answered this question by examining the reaction of various black leaders to a November, 1979, proposal by the East-West Gateway Coordinating Council to apply for a $100,000 federal grant under the Regional Housing Mobility Program. The funds would have assisted low-income St. Louis City blacks in relocating to St. Louis County. According to Dr. Jones, in January, 1980, St. Louis area black leaders opposed and helped to defeat the proposal. They opposed the proposal on the grounds that it would dilute black political power by dispersing the black population and that low-income blacks relocated in the suburbs would not have adequate access to key governmental and personal resources.

Dr. Jones' report also contained statistical analyses of three (3) relevant items. The first is the racial composition of the population in and surrounding the City of Fenton.[7] The results, based on census tracts, were, as follows:

7. Census tract 2214.01, while denominated "Fen- ton," encompasses both the City of Fenton *and*

| Tract | Location | Total 1980 | Total 1970 | Blacks 1980 | % 1980 | Blacks 1970 | % 1970 |
|-------|----------|-----------|-----------|-------------|--------|-------------|--------|
| 2181 | Valley Park City | 3,279 | 3,790 | 78 | 2.4 | 76 | 2.0 |
| 2211 | Kirkwood City | 1,813 | 1,970 | 28 | 1.5 | 4 | .2 |
| 2212.01 | Sunset Hills | 2,248 | 1,555 | 0 | 0 | 1 | .06 |
| 2212.02 | Sunset Hills | 5,955 | 6,055 | 5 | .08 | 1 | .02 |
| 2214.01 | Fenton | 5,748 | 3,886 | 21 | .4 | 4 | .1 |
| 7002.01 | Jefferson County | 14,970 | 11,020 | 11 | .07 | 1 | .01 |
| 7003.01 | Jefferson County | 10,528 | 6,997 | 11 | .1 | 1 | .01 |

Second, Dr. Jones examined the racial composition of the "poverty population" in St. Louis County in 1979. The results were, as follows:

Total Poverty Population: 46,417 (100.0%)
Whites: 30,590 ( 65.9%)
Blacks: 15,105 ( 32.5%)
American Indian: 85 ( 0.2%)
Asian: 637 ( 1.4%)

Finally, Dr. Jones did a study of the value of single-family housing in the City of Fenton and the ability of St. Louis City and/or County blacks to afford said housing in 1980.[8] The results were, as follows:

### BLACK ACCESS TO FENTON'S SINGLE–FAMILY HOUSING: 1980

| Single-Family Housing Value | Percent Fenton's Homes At This Value or Less | Percent Black Families Who Can Afford This Housing | | |
|---|---|---|---|---|
| | | City | County | City-County |
| Under $10,000 | 1.7% | 89.9% | 95.8% | 92.0% |
| $ 10,000 – $ 14,999 | 3.0% | 73.2% | 88.4% | 78.7% |
| $ 15,000 – $ 19,999 | 4.4% | 61.1% | 82.1% | 68.8% |
| $ 20,000 – $ 24,999 | 7.7% | 51.2% | 75.3% | 60.0% |
| $ 25,000 – $ 29,999 | 10.7% | 46.8% | 71.5% | 55.8% |
| $ 30,000 – $ 34,999 | 17.0% | 34.5% | 59.9% | 43.9% |
| $ 35,000 – $ 39,999 | 24.7% | 31.3% | 55.8% | 40.4% |
| $ 40,000 – $ 49,999 | 45.2% | 24.9% | 47.6% | 33.3% |
| $ 50,000 – $ 79,999 | 87.4% | 12.0% | 25.8% | 17.2% |
| $ 80,000 – $ 99,999 | 96.2% | 3.9% | 8.7% | 5.6% |
| $100,000 – $149,999 | 98.9% | 1.2% | 2.2% | 1.6% |
| $150,000 – $199,999 | 100.0% | 0.6% | 1.1% | 0.8% |

Thus, a substantial portion of Fenton's housing can be afforded by a large segment of St. Louis County's and St. Louis City's black families. Approximately 48% of the County's black families can purchase 45% of Fenton's homes and approximately 25% of the City's black families can purchase 45% of Fenton's homes.

For the sake of clarity, several limitations or deficiencies in Dr. Jones' report must be pointed out. First, in Part III, Dr. Jones' analysis of rental housing does not indicate the quantity, rental rates, and availability of rental property within the City of Fenton alone. Second, Part III of the report does not contain a statement of

an unincorporated area roughly equivalent to the size of the City of Fenton.

8. The assumptions made by Dr. Jones in this study were: "(1) Families can only afford hous-

es valued at 2.0 or less times less [sic] their annual income; and (2) cases are distributed evenly within each census housing value and income categories."

the bases or formula that Dr. Jones used to reach conclusions about affordability. Third, Dr. Jones does not define the standard that he used to reach his results concerning the "poverty population" in St. Louis County. However, plaintiffs did not discredit these results. Finally, his report does not attempt to render an opinion on the number of St. Louis City and/or County blacks who could or would move into Westview Heights and pay the market rent of $375 per month.

In his deposition, Dr. Jones stated his opinion that allowing Westview Heights to be built in Fenton would have an insignificant or "miniscule" impact on the broad pattern of racial segregation in the St. Louis area. He stated that 15% to 25% of the fifteen (15) § 8 units, or 2.5 to 3.75 units, in Westview Heights, would probably be occupied by black persons. By his estimates, then, roughly ten (10) to fifteen (15) black persons would live in Westview Heights. He stated that because a higher percentage of blacks than whites qualify for § 8 housing, exclusion of Westview Heights has a greater impact, by percentage, on blacks than whites. However, he also stated that by absolute numbers, more whites than blacks would be adversely affected by Fenton's action.

31. Under the § 8 program of the federal government, a qualified tenant receives a certificate from the Housing Authority of St. Louis County or City, finds a landlord with a unit meeting § 8 condition standards, and occupies the unit. The tenant pays a portion (27% in November, 1982) of his/her net income towards the rent of the unit and the federal government makes up the difference between the tenant's payment and the actual rent. The federal government establishes the maximum rents which can be paid and limits the number of certificates available for each jurisdiction.

32. The approximate number and racial composition of St. Louis City and County § 8 certificate holders in 1980 was, as follows:

| | Blacks | Whites |
| --- | --- | --- |
| St. Louis City: | 1100 | 900 |
| St. Louis County: | 760 | 1250 |
| Total: | 1860 | 2150 |

33. In the City of Fenton there is currently no undeveloped land that is zoned "G–1" multiple family. In the "Old Town" section of the City of Fenton there are a few tracts of land that are currently being used for multiple family dwellings. Moreover, in the eastern central portion of the City of Fenton there is a substantial strip of land that is currently being used for two (2) family dwellings. No evidence was adduced concerning the number of units in these tracts or the prices or rental rates of the units in these tracts.

34. Racial bias or prejudice was neither a motivating factor nor a factor at all in Mayor Morgan's decision to veto Ordinance No. 574 or his announcement of said veto at a special meeting of the Board of Aldermen. Bias or prejudice against subsidized housing also did not play any part in the Mayor's decision to veto Ordinance No. 574 or in his announcement of said veto at a special meeting of the Board of Aldermen.

35. Racial bias or prejudice against subsidized housing did not play any part in the July 20, 1981, decision of the Board of Aldermen and Mayor Morgan to deny Mr. Malone's request for an extension of "G–1" zoning on the Malone tract. Race or subsidized housing also was not a factor in the decision of City Attorney Utterback to invoke the reverter clause incorporated in Ordinance No. 335 or to send the matter back to the Planning and Zoning Commission.

36. If Westview Heights is developed as planned, it would have an insignificant or *de minimus* impact on the pattern of racially segregated housing in the St. Louis metropolitan area.

37. Although no blacks presently reside within the limits of the City of Fenton, plaintiffs did not prove that this is the result of racially motivated actions by the City of Fenton. There was no evidence that the City of Fenton has ever refused a

zoning classification to a developer of a project that would be likely to attract a significant number of blacks. There was no evidence that the City of Fenton, prior to dealing with the Malone tract, ever refused a zoning request by a developer of a low-income housing project. There was no evidence that the City of Fenton, by its official actions, contributed to or otherwise caused the racial migration trends and the pattern of racially segregated housing in the St. Louis metropolitan area. There was no evidence that the City of Fenton took any official action to oppose or otherwise prevent the development of the Valley Apartments or the Hawkins Village Apartments, both of which are multiple family, government assisted housing projects and both of which are geographically close to the City of Fenton. In sum, plaintiffs did not prove that the all-white characteristic of the City of Fenton is a result of racially motivated, exclusionary actions on the part of the City.

38. The impact of the City of Fenton's action with respect to the Malone tract does not bear more heavily on black persons than white persons.

### B. CONCLUSIONS OF LAW

This Court has jurisdiction over plaintiffs' claims and venue is proper pursuant to 28 U.S.C. §§ 1331, 1343, 1391(b), 1471 and 2201; 42 U.S.C. §§ 1981, 1982 and 1983; and 42 U.S.C. §§ 3612 and 3617.

Plaintiffs rely on several theories of liability to support a judgment in their favor, but for purposes of analysis plaintiffs' complaint can be viewed as alleging that defendant's action was illegal in four (4) respects. First, plaintiffs allege that defendant's zoning action was arbitrary and irrational and thereby violated their fourteenth amendment due process rights and 42 U.S.C. § 1983. Second, plaintiffs allege that defendant's conduct was motivated by discrimination against black persons and thereby violated the fourteenth amendment's guarantee of equal protection of the

laws and 42 U.S.C. § 1983. Third, plaintiffs allege that defendant's racially discriminatory conduct violated 42 U.S.C. §§ 1981 and 1982. Fourth, plaintiffs allege that defendant's conduct violated §§ 3604(a) and 3617 of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.[9] This Court will consider the question of standing and then separately analyze plaintiffs' theories of liability.

### 1. Standing To Sue

■ The analysis of the standing issue varies with respect to the type of plaintiff and the source of the right being asserted. "The principal lesson to be derived from the Supreme Court's standing decisions in fair housing cases is that a particular type of plaintiff has standing depending on which law he is proceeding under." R. Schwemm, *Housing Discrimination Law* at 388 (1983).

■ The requirements for standing to assert a constitutional claim are well-established by the Supreme Court's decisions. These requirements consist of "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional limitations are derived from Article III's requirement of a "case or controversy." *U.S. Const. Art. III.* In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Court identified the following as Article III's standing requirements: 1) plaintiff must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' " *id.* at 472, 102 S.Ct. at 758, quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); 2) plaintiff's injury " 'fairly can be traced to the challenged action,' " *Valley Forge,* 454 U.S. at

---

9. Originally, plaintiffs also relied on 42 U.S.C. § 1985. However, that claim was dismissed voluntarily on plaintiffs' motion during trial. Accordingly, it is no longer before this Court.

472, 102 S.Ct. at 758, quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); and 3) plaintiff's injury " 'is likely to be redressed by a favorable decision,' " *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758, quoting *Simon*, 426 U.S. at 38, 96 S.Ct. at 1924. *See also, Allen v. Wright*, —— U.S. ——, ———, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984); *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 260–63, 97 S.Ct. 555, 560–62, 50 L.Ed.2d 450 (1977); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972); *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). *See generally Hope, Inc. v. County of DuPage, Illinois*, 738 F.2d 797 (7th Cir.1984).

■ Prudential limitations on standing generally fall into two (2) categories: 1) plaintiff's injury must be distinct and not a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205; and 2) "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," *id.* These prudential limitations "serve to limit the role of the courts in resolving public disputes." *Id.* at 500, 95 S.Ct. at 2206. *See also Arlington Heights*, 429 U.S. at 263, 97 S.Ct. at 562.

■ Unlike Article III standing requirements, however, the prudential limitations may be obviated where Congress "grant[s] an express right of action to persons who otherwise would be barred by prudential standing rules." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206. The Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, is an example of such an express Congressional grant of a right of action. In three separate cases, the Supreme Court held that prudential limitations on standing do not apply to actions brought under the Fair Housing Act. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). The result of these decisions is that "the sole requirement for standing to sue under [the Fair Housing Act] is the Art. III minima of injury in fact . . . ." *Havens Realty Corp.*, 455 U.S. at 372, 102 S.Ct. at 1120. Thus, a Fair Housing Act plaintiff has standing if said plaintiff alleges that he suffered an Article III injury in fact as a result of defendant's violation of *someone's* Fair Housing Act rights. *Id.* at 376 n. 16, 102 S.Ct. at 1123 n. 16; *Gladstone, Realtors*, 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9.

With respect to the Civil Rights Acts of 1866, 42 U.S.C. §§ 1981, 1982 and 1983, the Supreme Court has not yet clearly determined the extent to which prudential limitations on standing apply to plaintiffs suing thereunder. However, the Court's decision in *Warth* strongly suggests that the prudential limitation preventing parties from raising rights other than their own is fully applicable to actions under the Civil Rights Acts of 1866. In *Warth*, the Court denied standing to certain plaintiffs whose claim was that "they [had] been harmed indirectly by the exclusion of others." *Warth*, 422 U.S. at 514, 95 S.Ct. at 2213. The *Warth* plaintiffs alleged that the defendants' intentional discrimination against black persons, by excluding low-income multi-family housing, deprived plaintiffs "of the benefits of living in a racially and ethnically integrated community." *Id.* at 512, 95 S.Ct. at 2212. The Court viewed this as "an attempt to raise putative rights of third parties, and none of the exceptions that allow such claims [was] present . . . ." *Id.* As an example of such an "exception," the *Warth* Court, in a footnote, cited its earlier decision in *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). *See Warth*, 422 U.S. at

514 n. 22, 95 S.Ct. at 2213 n. 22. In *Sullivan*, the Court held that a white lessor, who was expelled from membership in Little Hunting Park for assigning his membership to a black lessee in violation of a restrictive covenant, had standing to raise his black lessee's rights under § 1982. The *Sullivan* Court found that the prudential limitation against raising the rights of third parties was inapplicable because the white lessor plaintiff was " 'the only effective adversary' of the unlawful restrictive covenant." *Sullivan*, 396 U.S. at 237, 90 S.Ct. at 404, quoting *Barrows v. Jackson*, 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1952). However, the *Warth* Court indicated that *Sullivan* is limited to situations where a white plaintiff alleges: 1) that he has a "contractual or other relationship protected under §§ 1981 and 1982" with a black person who has been excluded by a defendant; and 2) that "such relationship was either punished or disrupted by" said defendant. *Warth*, 422 U.S. at 514 n. 22, 95 S.Ct. at 2213 n. 22. *See generally*, R. Schwemm, *Housing Discrimination Law* at 323 (1983).

Applying the above principles to the facts of this case, it is the opinion of this Court that the "developer plaintiffs" have standing to raise both their own rights and the rights of blacks who allegedly were adversely affected by defendant's action. On the other hand, it is the opinion of this Court that plaintiff Bryson lacks standing and his motion to intervene must be denied.

The developer plaintiffs are the Malones, Robert Wright, Glennon Moran and Jean Gerber. Each of these plaintiffs has an ownership interest in the Malone tract and the proposed Westview Heights project. *See Findings of Fact No. 20.* Each of these plaintiffs is white. *Id.* It is clear that each of these plaintiffs meets the minimum standing requirements of Article III.

As a result of defendant's refusal to zone the Malone tract "G–1" multiple family, plaintiffs have lost or will lose substantial sums of money which they invested in the Westview Heights project. *Id.* Moreover, this actual or threatened economic injury is causally related to defendant's conduct and, if a judgment is rendered in favor of the developer plaintiffs, this injury is "likely to be redressed." Therefore, the developer plaintiffs have Article III standing to vindicate, at a minimum, their own rights.

During trial [10] plaintiffs represented to this Court that they were asserting their own rights on their fourteenth amendment claims and both their own rights and those of third parties on their statutory claims. There is no problem with the developer plaintiffs asserting their own rights on their claim that defendant's zoning decision was arbitrary and irrational and thus violated the due process clause of the fourteenth amendment. In addition, there is no problem with the developer plaintiffs asserting their own rights on the due process claim under 42 U.S.C. § 1983.

The remainder of the developer plaintiffs' claims, however, present more difficult standing problems. The fourteenth amendment equal protection claim, the corresponding 42 U.S.C. § 1983 claim, the 42 U.S.C. §§ 1981 and 1982 claims, and the Fair Housing Act claims all depend on racial discrimination of some type. With respect to these claims, the developer plaintiffs allege that defendant discriminated against black prospective tenants of Westview Heights on account of their race by exclusionary zoning.

As discussed *supra*, even though the developer plaintiffs are not black, they have standing to assert the rights of black persons under the Fair Housing Act.[11]

---

**10.** Specifically, on June 22, 1983.

**11.** Defendant argues that none of the Supreme Court's Fair Housing Act standing cases are applicable because in each case racial or minority interests were involved, whereas plaintiffs here have purely economic interests. To support this argument defendant cites *Nasser v. City*

*of Homewood*, 671 F.2d 432 (11th Cir.1982). Defendant's argument must fail for three (3) reasons.

First, it is not true that plaintiffs' interests are purely economic. The project plaintiffs seek to develop would house some minority tenants, *see*

Based on plaintiffs' allegations, the developer plaintiffs also have standing under § 3617 of the Fair Housing Act to assert their own rights. Section 3617 prohibits interference with persons who aid or encourage other persons in the enjoyment of rights protected by § 3604. 42 U.S.C. § 3617. As Professor Schwemm points out, "a number of exclusionary zoning cases have held that a municipality's refusal to permit a developer to build housing for minorities not only violates § 3604(a), but also unlawfully interferes with the developer and his prospective tenants under § 3617." R. Schwemm, *Housing Discrimination Law* at 198 (1983). *See, e.g., Metropolitan Housing Development Corporation v. Village of Arlington Heights,* 558 F.2d 1283, 1288 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack,* 508 F.2d 1179, 1188 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *United States v. City of Parma, Ohio,* 494 F.Supp. 1049, 1094–1101 (N.D.Ohio 1980), *aff'd as modified,* 661 F.2d 562 (6th Cir.1981), *cert. de-*

*nied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).

The developer plaintiffs' claims under the equal protection clause of the fourteenth amendment and the Civil Rights Acts of 1866, 42 U.S.C. §§ 1981, 1982 and 1983, are, as discussed *supra,* subject to the prudential limitation against raising the rights of third parties.[12] However, in the opinion of this Court the "only effective advocate" exception applies to allow the developer plaintiffs to raise the rights of their prospective black tenants. According to plaintiffs' allegations, the discriminatory intent of defendant was "really directed at an as yet unidentifiable group of people, i.e., blacks who might become tenants of the housing." *Gordon v. City of Cartersville, Georgia,* 522 F.Supp. 753, 757 (N.D. Ga.1981). In this situation, "[t]he developers are the only effective adversaries ...." *Id. See Sullivan,* 396 U.S. at 237, 90 S.Ct. at 404; *Barrow,* 346 U.S. at 259, 73 S.Ct. at 1036; *West Zion Highlands v. City of Zion,* 549 F.Supp. 673, 676 (N.D.Ill.1982);

---

*Findings of Fact No. 30,* and therefore it is affected by racial or minority interests.

Second, *Nasser,* which failed to discuss *Havens* even though *Nasser* was decided one month after *Havens* was decided, is factually inapposite. The undisputed facts in *Nasser* were that there was no "live" plan to build a low-income housing complex at the time the suit was filed and that there was no direct evidence that minorities would have inhabited said complex even if it was a viable project.

Finally, defendant's argument and *Nasser* fail to account for the express language of the Supreme Court in its footnotes in *Havens* and *Gladstone. Havens,* 455 U.S. at 376 n. 16, 102 S.Ct. at 1123 n. 16; *Gladstone,* 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9.

**12.** Section 1981 guarantees the right "to make and enforce contracts" on a nondiscriminatory basis. 42 U.S.C. § 1981. Section 1982 guarantees the right, *inter alia,* to "lease ... real ... property" on a nondiscriminatory basis. Arguably these sections can be interpreted to give non-minority plaintiffs a cause of action where a defendant allegedly interfered with the non-minority plaintiffs' right to make contracts with or lease real property to minorities. In *Gordon v. City of Cartersville, Georgia,* 522 F.Supp. 753 (N.D.Ga.1981), the Court discussed several cases where standing was granted to a non-minority

plaintiff who "was asserting *his own right to be free from injury generated by the defendant's racially motivated conduct." Id.* at 757 (emphasis in original). *See, e.g., DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306 (2d Cir.1975); *Faraca v. Clements,* 506 F.2d 956 (5th Cir.1975); *Riccobono v. Whitpain Tp.,* 497 F.Supp. 1364 (E.D.Pa. 1980). This Court holds that the white developer plaintiffs have standing to assert the §§ 1981 and 1982 rights of black persons under the "only effective advocate" exception to the prudential limitation against raising the rights of third persons. Accordingly, this Court need not decide whether non-minority plaintiffs have a cause of action in their own right under said statutes for minority-based discrimination that has a direct impact on non-minority plaintiffs. *Cf. Des Vergnes v. Seekonk Water District,* 601 F.2d 9, 14 (1st Cir.1979) (whites have implied right of action under § 1981 against another who, with racially discriminatory intent, interferes with his right to make contracts with non-whites), *on remand,* 498 F.Supp. 463 (D.Mass. 1980), *aff'd as to liability and remanded,* 648 F.2d 761 (1st Cir.), *vacated,* 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981), *rev'd award of punitive damages,* 670 F.2d 1 (1st Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982); *cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 67 (1982).

*Riccobono v. Whitpain Tp.,* 497 F.Supp. 1364, 1373 (E.D.Pa.1980). *Contra Halet v. Wend Investment Co.,* 672 F.2d 1305, 1308 (9th Cir.1982). Moreover, allowing the developer plaintiffs to assert the equal protection clause [13] and Civil Rights Acts of 1866 rights of their prospective black tenants does not contravene footnote 22 of *Warth.* This Court does not read footnote 22 as limiting *Sullivan*-type standing to cases where a white plaintiff has an *existing* "contractual or other relationship protected under §§ 1981 and 1982" with a black person. *Warth,* 422 U.S. at 514 n. 22, 95 S.Ct. at 2213 n. 22. It should also extend to the situation where, as here, a white plaintiff alleges interference, on account of race, with said plaintiff's *prospective* contractual and leasehold relationship with a black person. Indeed, in such a situation the status of a white plaintiff as the "only effective advocate" is even more compelling because the black person is as yet unknown. *See Park View Heights Corporation v. City of Black Jack,* 467 F.2d 1208, 1212–14 (8th Cir.1972).

 Turning to plaintiff Bryson, it is the opinion of this Court that he lacks Article III standing and, therefore, his motion to intervene must be denied. Simply put, the facts do not support his allegation that "he personally has suffered some actual or threatened injury" of the kind that would support the invocation of this Court's jurisdiction. Unlike the individual plaintiff in *Arlington Heights,* Mr. Bryson would be farther from work than he is now if he were to move into Westview Heights. *See Findings of Fact No. 21. Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 562 ("The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted ...."). One of his rea-

sons for expressing interest in Westview Heights, that he would like to live in the Lindbergh School District, is factually flawed. *See Findings of Fact Nos. 21, 28.* There was no evidence that Mr. Bryson would qualify for § 8 housing if Westview Heights were built or that he could afford the market rate rent if he did not qualify. *See Warth,* 422 U.S. at 504–06, 95 S.Ct. at 2208–09. Moreover, the minimal effort which he made in "trying" to move to Fenton and the fact that he would only "possibl[y]" want to move to Westview Heights, leads this Court to conclude that he lacks such a " 'personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the Court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205.[14]

Denial of standing to Bryson, however, has no significant impact on the posture of this case, because the developer plaintiffs have standing to petition this Court to reach the merits of each of their claims.

### 2. *Merits of Plaintiffs' Claims*

#### a. *Fourteenth Amendment Due Process and 42 U.S.C. § 1983 Claims*

Plaintiffs' first claim is that the City of Fenton's zoning action was both arbitrary and irrational and, therefore, violated plaintiffs' fourteenth amendment due process rights.

 The due process clause of the fourteenth amendment guarantees, *inter alia,* the right of a property owner to be free from arbitrary or irrational zoning actions. *Arlington Heights v. Metropolitan Hous-*

---

13. This, of course, answers the question left undecided in *Arlington Heights,* 429 U.S. at 263, 97 S.Ct. at 562. However, as discussed *infra,* plaintiff Bryson lacks Article III standing and, unlike *Arlington Heights,* there is no "individual plaintiff who has demonstrated standing to assert these rights as his own." *Id.* at 264, 97 S.Ct. at 562. *See also West Zion Highlands v. City of Zion,* 549 F.Supp. 673, 676 (N.D.Ill.1982) (Civil Rights Acts standing of white developer is on

"same footing" as equal protection clause standing).

14. Indeed, given the manner in which Mr. Bryson decided to move for intervention, this Court is left with the impression that his intentions were less than genuine and that his motion was the result of the developer plaintiffs' eleventh hour fear that this Court would deny them standing.

*ing Corporation,* 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797 (1974); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Burns v. City of Des Peres,* 534 F.2d 103, 108 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *McMahon v. City of Dubuque, Iowa,* 255 F.2d 154, 160 (8th Cir.), *cert. denied,* 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958). To establish a violation of this right, "plaintiff is required to prove that the defendants' actions were clearly arbitrary, unreasonable and ... bore no substantial relation to the health, safety, convenience and welfare of the community." *Burns,* 534 F.2d at 108 (citations omitted).

In the case at bar, plaintiffs failed to establish a violation of their due process right. Fenton's denial of "G–1" multiple family zoning for the Malone tract was rational, because the most appropriate, highest and best use of the Malone tract is industrial. *See Findings of Fact No. 19.* The uses surrounding the Malone tract, the absence of nearby retail shops, the lack of public transportation, and the fact that the Malone tract is not near recreational or emergency facilities render it undesirable for multiple family use. *See Findings of Fact Nos. 15, 18.* In addition, Mayor Morgan's decision to veto Ordinance No. 574, which would have re-zoned the Malone tract "G–1" multiple family, was reasonably based on his legitimate concern with the sewer problems in Fenton. *See Findings of Fact Nos. 15, 23.* Although capacity was not a problem when the Mayor vetoed Ordinance No. 574, at the same time the sewer system was being properly operated by MSD only on a temporary basis. *See Findings of Fact No. 23.* Mayor Morgan was reasonably concerned that, if Westview Heights was developed and if the sewer system's problems were not permanently solved, the health and safety of Fenton's residents would be in jeopardy. *See Findings of Fact No. 15.* His decision was, at the least, substantially related to the health and safety of the community, and thus plaintiffs' first claim must fail.

**b.** ***Fourteenth Amendment Equal Protection and Civil Rights Acts of 1866 Claims***

Plaintiffs' second and third claims are that defendant's action was violative of the equal protection clause of the fourteenth amendment, *U.S. Const.amend. XIV,* and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982 and 1983. Section 1983, of course, is dependent on a violation of a federal constitutional or statutory right and therefore the analysis of plaintiffs' equal protection claim mirrors that of their § 1983 claim. As discussed *supra,* though, §§ 1981 and 1982 create substantive rights independent of the Constitution. *See* note 12, *supra.* Sections 1981 and 1982 protect the rights to make contracts and to lease real property, respectively, free from discrimination on the basis of race. 42 U.S.C. §§ 1981 and 1982. *See Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). Generally, housing discrimination that violates § 1982, also violates § 1981. *See, e.g., Tillman v. Wheaton-Haven Recreation Association, Inc.,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 441–43 n. 78, 88 S.Ct. 2186, 2204–05 n. 78, 20 L.Ed.2d 1189 (1968). *See generally,* R. Schwemm, *Housing Discrimination Law* at 330–31 (1983).

It is not clear, however, whether proof of discriminatory intent, which is necessary to prove a constitutional violation, *see Washington v. Davis,* 426 U.S. 229, 239–40, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), is necessary to establish a violation of §§ 1981 and 1982. *See generally,* R. Schwemm, *Housing Discrimination Law* at 315, 324 (1983). Professor Schwemm points out that several decisions, including two (2) from the Eighth Circuit, held that a violation of § 1982 can be established by proof of discriminatory effect alone. *Id.* at 324 n. 141. *See, e.g., Smith v. Anchor Building Corp.,* 536 F.2d 231, 233 (8th

Cir.1976); *Williams v. Matthews Company,* 499 F.2d 819, 826 (8th Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

Two (2) observations can be made about these cases. First, in both cases the § 1982 claim was joined with a Fair Housing Act claim. An equal protection claim was not present in either case. Because discriminatory impact suffices to prove a violation of the Fair Housing Act,[15] treating the elements of the Fair Housing Act claim and the § 1982 as the same did not significantly affect the outcome of those two (2) cases. Second, both cases were decided prior to *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), where the Supreme Court held that intentional discrimination is an essential element of a claim under § 1981. *Id.* at 382–91, 102 S.Ct. at 3145–50. *See* R. Schwemm, *Housing Discrimination Law* at 324–25 (1983) ("... *General Building* at least casts some doubt on the proposition that § 1982 should apply to discriminatory effect cases in the same way that [the Fair Housing Act] does.")

 In the opinion of this Court, discriminatory intent is also an essential element of a claim under § 1982. *See Denny v. Hutchinson Sales Corporation,* 649 F.2d 816, 822 (10th Cir.1981); *Bendetson v. Payson,* 534 F.Supp. 539, 541 (D.Mass. 1982). Accordingly, this Court's analysis of plaintiffs' Civil Rights Acts claims is identical to that of their equal protection claim and this Court treats said claims as one for the purpose of answering the central issue: was defendant's zoning action based on intentional discrimination against black persons?

The seminal case on intentional discrimination in housing, by exclusionary zoning, is *Village of Arlington Heights v. Metropolitan Housing Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See generally,* R. Schwemm, *Housing Discrimination Law* at 337–39 (1983). In *Arlington Heights,* the Metropolitan Housing Development Corporation sought to have a parcel of land, located in an all-white Chicago suburb, rezoned to allow them to build a racially integrated low-income housing complex known as "Lincoln Green". The Village denied the rezoning request and plaintiffs (the developer and three black persons) sued, alleging violations of the equal protection clause and the Fair Housing Act. The District Court rendered a judgment for the Village on the ground that the Village's action was not motivated by racial discrimination. The Court of Appeals reversed the District Court, holding that the Village was liable because its decision disproportionately affected blacks. The Supreme Court reversed and held, relying on *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), that proof of racially discriminatory intent or purpose is necessary to show a violation of the equal protection clause and that plaintiffs had failed to prove such intent. *Arlington Heights,* 429 U.S. at 264–71, 97 S.Ct. at 562–66.[16]

The *Arlington Heights* Court was very illuminating on the question of what must be shown to prove a discriminatory purpose and the factors that are relevant to the inquiry. A plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes ....", but rather "that a discriminatory purpose [was] a motivating factor in the decision ...." *Id.* at 265–66, 97 S.Ct. at 563. The Court identified the following six (6) factors or items of evidence as relevant to determining whether racial discrimination was a motivating factor: 1) the impact of the official action; 2) the historical background of the decision; 3) the sequence of events leading up to the challenged decision; 4) the extent

---

**15.** *See* discussion, *infra.*

**16.** The Court did not decide whether plaintiffs established a violation of the Fair Housing Act, but remanded that question to the Court of Appeals. *Arlington Heights,* 429 U.S. at 271, 97

S.Ct. at 566. *See Metropolitan Housing Development Corporation v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977, *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

of adherence to or departure from the normal procedural sequence; 5) the extent of adherence to or departure from the normal substantive factors; and 6) the legislative or administrative history. *Id.* at 266–68, 97 S.Ct. at 563–65.

The focus of the first factor, the impact of the decision, is on "whether [the decision] 'bears more heavily on one race than another' ...." *Id.* at 266, 97 S.Ct. at 564, quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). This inquiry requires an analysis of statistical evidence, but the Court expressly recognized "the limited probative value" of such evidence and indicated that "impact alone is not determinative ...." *Arlington Heights*, 429 U.S. at 266 & n. 15, 97 S.Ct. at 564 & n. 15. Analyzing the impact of the municipal decision in *Arlington Heights*, the Court concluded:

> The impact of the Village's decision does arguably bear more heavily on racial minorities. Minorities constitute 18% of the Chicago area population, and 40% of the income groups said to be eligible for Lincoln Green.

*Id.* at 269, 97 S.Ct. at 565.

■ In the case at bar, plaintiffs rely almost entirely on a single comparative "statistic" to establish that Fenton's action bears more heavily on black persons than white persons. This statistic is that the percentage of all black persons in the St. Louis area who qualify for § 8 housing is higher than the percentage of all white persons in the St. Louis area who qualify for § 8 housing. The truth of this percentage comparison was established by the testimony of both Dr. Farley and Dr. Jones. *See Findings of Fact Nos. 29, 30.*[17]

■ Although plaintiffs' statistic is relevant, as it does tend to prove that defendant's action has a disparate impact on blacks, it is the opinion of this Court that plaintiffs did not carry their burden of proving such an impact. There are two (2) reasons for this conclusion.

First, the statistic that plaintiffs rely on is of limited probative value. There was no evidence of the precise percentages being compared. Dr. Jones did state in his deposition that the percentage of blacks who qualify for § 8 housing is two (2) or three (3) times greater than the percentage of whites who so qualify. However, in the absence of specific percentage amounts, plaintiffs' statistic is still of limited probative value.

Plaintiffs' statistics is also of limited probative value because of the percentages that it compares. Plaintiffs' statistic begins with two "pools": the pool of white persons and the pool of black persons in the St. Louis area. Plaintiffs' statistic then compares the percentage of each pool that qualifies for § 8 housing. In *Arlington Heights*, the Supreme Court found a different comparison relevant to the disparate impact factor. There the Court compared the percentage of blacks in the Chicago area population (18%) to the percentage of blacks who qualified for the type of housing that was excluded (40%). Here, the evidence is that 12.5% of the St. Louis area population is non-white, *see Findings of Fact No. 30*, but there is no evidence of what the precise percentage of non-whites who qualify for § 8 housing is. Thus, based on the evidence in this case, this Court is unable to make the statistical comparison that the *Arlington Heights* Court found relevant.[18]

---

**17.** Dr. Farley also enumerated several other aspects in which defendant's action bears more heavily on blacks than whites, *see Findings of Fact No. 29,* but said other aspects are not relevant to the *Arlington Heights*-type disparate impact inquiry. Said aspects are relevant to the Fair Housing Act-type disparate impact inquiry, because the Fair Housing Act is concerned with two (2) types of impact: 1) impact on minorities; and 2) impact on segregated housing patterns. *See Metropolitan Housing Development*

*Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977). *See also, infra.*

**18.** A hypothetical example demonstrates why plaintiffs' failure of proof is significant. Assume that 12.5% of the St. Louis area population is not white and that the percentage of blacks who qualify for § 8 housing is approximately three (3) times greater than the percentage of whites who so qualify. This Court is left to speculate as to what these precise percentages

"Statistical evidence, of course, is nothing but a form of circumstantial evidence." *McCleskey v. Zant,* 580 F.Supp. 338, 350 (N.D.Ga.1984) (discussion of multiple regression analysis). In the employment discrimination area, the Supreme Court summarized the value of statistics, as follows:

> ... statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.

*Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). The second reason that plaintiffs did not prove disparate impact is that defendant's statistical evidence established that defendant's action does not have a disparate impact on blacks.

Defendant's statistics, which were not contradicted by plaintiffs, show that in terms of numbers there are more whites than blacks in the St. Louis area who qualify for § 8 housing. *See Findings of Fact No. 30.* It follows from this fact that the percentage of persons qualifying for § 8 housing who are white is greater than the percentage of persons qualifying for § 8 housing who are black. In the opinion of this Court, this is the most probative evidence in this case on the question whether defendant's action bears more heavily on one race than another. In *Betsey v. Turtle Creek Associates,* 736 F.2d 983 (4th Cir. 1984), a Fair Housing Act disparate impact case, the Court held that the correct inquiry was whether the challenged policy (adults-only in a particular apartment building) "had a disproportionate impact on *the minorities in the total group to which the policy was applied.*" At 987 (emphasis added). *See also Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065 (4th Cir. 1982) (focused on racial composition of

group in need of the excluded housing); *Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867, 878 (6th Cir.1975) (compared the percentage of those eligible for public housing who were black to percentage of those eligible for public housing who were white). Here, the only persons who are adversely affected by defendant's action in terms of § 8 housing, are those who qualify for § 8 housing. Therefore, focusing on the racial composition of the pool of persons who qualify for § 8 housing is more instructive on the issue of disparate impact than focusing on the proportion of each race that qualifies for § 8 housing.

Another probative statistic offered by defendant is this: of the 4010 persons in the St. Louis area who possess § 8 certificates, 1860 are black and 2150 are white. *See Findings of Fact No. 32.* Arguably, defendant's action bears most heavily on those who possess § 8 certificates but cannot move to Fenton due to the absence of § 8 housing there. The above statistic shows that more whites than blacks are so affected. In the opinion of this Court, defendant's statistics rebut any inference of disparate impact that can be drawn from plaintiffs' proof. *See Findings of Fact No. 38.*

■ The second factor that is relevant to the issue of discriminatory intent is the historical background of the decision in question. In *Arlington Heights,* the Court stated that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564 (citations omitted). Plaintiffs argue that the historical background of Fenton's action demonstrates that the reasons given by the Mayor for vetoing Ordinance No. 574 were pretextual and that Fenton's handling of the Malone tract is another mani-

---

are. Percentages of 12.5% and 4% may, for all the evidence shows, be the correct percentages of blacks and whites, respectively, who qualify for § 8 housing. However, using these statistics and the Court's analysis in *Arlington Heights,* there is no disparate impact because 12.5% is both the percentage of non-whites in the St.

Louis area population and the percentage of blacks who qualify for § 8 housing. Plaintiffs did not prove what the percentage of blacks who qualify for § 8 housing is and this Court cannot find for plaintiffs on the basis of speculation and conjecture.

festation of Fenton's opposition to multiple family housing. Because this Court rejects both arguments, the historical background of Fenton's decision does not suggest that it was motivated by a discriminatory purpose.

The reasons given by Mayor Morgan for vetoing Ordinance No. 574 were far from pretextual and do not evidence invidious discriminatory intent. Essentially, Mayor Morgan gave two (2) justifications for his veto. *See Findings of Fact No. 15.* The first was that the concept of the Malone tract as a "buffer zone" had become obsolete because, due to recent developments, the most appropriate use of the property is industrial. Not only was this reason not pretextual, but this Court agrees with Mayor Morgan as a matter of fact.[19] *See Findings of Fact No. 19.* At one time, the Malone tract might reasonably have been viewed as a buffer between residential and industrial uses. However, the development in the late 1970's and early 1980's of industrial uses, which are directly across from residential uses and which virtually surround the Malone tract, rendered the Malone tract useless as a buffer. *See Findings of Fact Nos. 17, 18 and 19.* Mayor Morgan clearly had these developments in mind when he stated that "circumstances have drastically changed ...." *See Findings of Fact No. 15.* In addition, Fenton's controlled development of industrial uses obviated the need for a buffer between residential and industrial uses. *See id.* That this justification is not pretextual is also supported by Mayor Morgan's reasonable reliance on Mel West's report and the St. Louis County Economic Development Report. *See id.*

The second justification was the sewer problem. Plaintiffs contend that, in fact, there wasn't a problem and rely heavily on defendant's stipulation that, on March 30, 1982, there were no operational problems with the sewer system. However, Mayor Morgan's second justification was not pre-

textual because there was a sewer problem even though there were no operational problems on March 30, 1982. *See Findings of Fact No. 23.* Fenton experienced serious operational and management problems when the system was run by RSD. *See id.* It is true that Fenton was not experiencing these problems on March 30, 1982. However, this was because MSD was temporarily operating the system. *See id.* The sewer problem was a non-pretextual justification · because of the temporary nature of MSD's involvement on March 30, 1982. Mayor Morgan emphasized the conditional nature of this second justification—his objection to Ordinance No. 574 on the basis of sewers would last *until* the RSD situation was resolved with some certainty. *See Findings of Fact No. 15.* The non-pretextual nature of the sewer justification is also supported by Fenton's prior opposition to a luxury housing development and a commercial development on the basis of sewer problems, *see Findings of Fact No. 24,* and the fact that the sewer situation had been a concern with respect to the Malone tract several times prior to the Mayor's veto. *See Findings of Fact Nos. 8, 9, 13 and 23.* While it is not the role of this Court to determine whether Mayor Morgan correctly vetoed Ordinance No. 574, as a matter of public policy or good decision-making, it is clear that ·his reasons were not a pretext for racial discrimination.

Plaintiffs next argue that Fenton's prior opposition to subsidized housing was motivated by racial discrimination and thus tends to prove that Fenton's decision with respect to Westview Heights was similarly motivated. The evidence established that Fenton opposed two (2) multiple family housing projects other than Westview Heights. *See Findings of Fact No. 24.* The "Barton Woods" project was to be located just outside of Fenton and would have contained § 8 units. *See id.* Fenton's opposition to the project was based on concerns, supported by an engineering report and MSD, about sewage disposal. *See*

---

**19.** In this regard, it is worth noting that Mr. Malone himself intimated at the October 7, 1981, meeting of the Planning and Zoning Com-

mission that "G–1" multiple family was not the correct zoning classification for the Malone tract. *See Findings of Fact No. 10.*

*id.* Plaintiffs did not prove that this basis was pretextual or that Fenton had an ulterior motive, such as racial discrimination. *See id.* Fenton also opposed a multiple family project known as "The Timbers" on the ground of sewer problems. *See id.* However, said opposition does not even remotely tend to prove racial animus because "The Timbers" development was to be a luxury condominium project. *See id.* Moreover, the fact that Fenton expressed concern about sewage problems caused by luxury housing, as well as subsidized housing, tends to further support this Court's conclusion that Fenton's reliance on the sewer issue as a justification for its action was not pretextual. In addition, there was no evidence that Fenton opposed the Valley Apartments or the Hawkins Village Apartments, both of which are existing multiple family assisted housing located near Fenton. *See Findings of Fact No. 30.*

◾ The sequence of events leading to the challenged decision is the third factor. The *Arlington Heights* Court gave the following example of how the specific sequence "may shed some light on the decisionmaker's purposes":

> [I]f the property involved here always had been zoned [multiple family] but suddenly was changed to [single family] when the town learned of MHDC's plans to erect integrated housing, we would have a far different case.

*Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. In the case at bar, plaintiffs argue that Fenton did not oppose Westview Heights until it learned that § 8 units would be part of the project. Thus, plaintiffs argue that this is the "far different case" referred to in *Arlington Heights.*

Plaintiffs contend that Fenton did not learn of the § 8 aspect of Westview Heights, or HUD's involvement, until Mr. Malone's May 7, 1981, letter to the Board of Aldermen. *See Findings of Fact No. 8.* While May 7, 1981, was probably the first time that *Mr. Malone* so informed Fenton, it is clear that the City was aware, as early as 1979, of the probable inclusion of § 8 units and the probable involvement of HUD in Westview Heights. *See Findings of Fact No. 8.* Accordingly, the sequence of events does not "spark suspicion" of Fenton's motives. *Arlington Heights,* 429 U.S. at 269, 97 S.Ct. at 565.

Even the events subsequent to the May 7, 1981, letter do not lead this Court to doubt Fenton's motives. The Board of Aldermen, after all, voted to zone the Malone tract "G–1" multiple family on March 15, 1982. *See Findings of Fact No. 14.* The only reason the Malone tract is not presently zoned "G–1" multiple family is the fact that Mayor Morgan vetoed Ordinance No. 574 and this Court has already concluded that Mayor Morgan's motives for exercising his veto authority were not improper. *See Findings of Fact Nos. 15, 18, 19 and 23.*

◾ The fourth factor is whether there were any departures from the normal procedural sequence of decision-making. Plaintiffs contend that there were several such departures. First, plaintiffs argue that Fenton departed from the normal procedural sequence on January 18, 1982, when Mr. Utterback recommended that the question of zoning on the Malone tract go back to the Planning and Zoning Commission. *See Findings of Fact No. 11.* Plaintiffs argue that because the Commission had just considered it on January 6, 1982, *see Findings of Fact No. 10,* the matter should have remained before the Board of Aldermen. Assuming that plaintiff proved that under normal procedures the matter should have stayed before the Board of Aldermen, which is doubtful because the use of the reverter clause was not normal, the City's departure was insignificant and does not evidence discriminatory intent. *See Findings of Fact No. 35.*

The use of the reverter clause in Ordinance No. 171 is the second item which plaintiffs characterize as a procedural departure. This was the first time that Fenton invoked the reverter clause. *See Findings of Fact No. 27.* Thus, plaintiffs argue that the normal procedure was to "ignore" the reverter clause. In the opinion of this Court, however, the uniqueness of the

City's use of the reverter clause can be explained by the apparent uniqueness of the history of the Malone tract. Developers had failed to develop the Malone tract as represented for over nine (9) years at the time the Malone tract was being considered in January of 1982. *See Findings of Fact No. 27.* Moreover, intervening developments rendered the buffer purpose of the Malone tract obsolete and made the best use of the land industrial. *See Findings of Fact Nos. 15, 18 and 19.* As Mayor Morgan pointed out in his veto message, the purpose of the "G–1" zoning classification was to allow for "review of the zoning ... if development did not occur within [the] time frame" or circumstances changed. *See Findings of Fact No. 15.* Both contingencies occurred here and therefore provide a non-discriminatory explanation for the use of the reverter clause. *See Findings of Fact No. 35.* This would be a different case if there was evidence that similar contingencies occurred in the past in Fenton and that the reverter clause was not invoked, but no such evidence was presented. *See Findings of Fact No. 27.*

◼ The final manner in which defendant allegedly departed from normal procedures was Mayor Morgan's announcement of his veto at a special, as opposed to a regular, meeting of the Board of Aldermen. *See Findings of Fact No. 15.* Plaintiffs contend that Mo.Rev.Stat. § 79.140 required Mayor Morgan to veto Ordinance No. 574 only at the next regular meeting. Section 79.140 provides, in part, as follows:

> The mayor shall have power to sign or veto any ordinance passed by the board of alderman; provided, however, that should he neglect or refuse to sign any ordinance and return the same with his objections, in writing, at the next regular meeting of the board of alderman, the same shall become a law without his signature.

Mo.Rev.Stat. § 79.140. In the opinion of this Court, the proviso in the last portion of § 79.140 does not have the effect of requiring a mayor to veto an ordinance only at the next regular meeting. The statute does not purport to prescribe any mandatory procedure for vetoing ordinances. The effect of the proviso clause is simply that if a mayor fails to sign or veto an ordinance between the time it is passed and the time of the next regular meeting, then it takes effect as a law without said mayor's signature. Moreover, even if Mayor Morgan did depart from normal procedures by vetoing Ordinance No. 574, there was no evidence that Mayor Morgan did so intentionally or as a result of a racially discriminatory motive. *See Findings of Fact No. 34.* If there was merely a departure, it was a technical departure that did not significantly affect the final result, i.e., defeat of Ordinance No. 574.

◼ The fifth factor is whether there were any substantive departures. The *Arlington Heights* Court stated that this factor is relevant, "particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Plaintiffs contend that Mayor Morgan's rejection of the buffer role of the Malone tract was such a departure.[20]

It is true that the rejection of the need for "G–1" multiple family zoning on the Malone tract as a buffer was a departure from factors considered important when the Malone tract was originally zoned "G–1". *See Findings of Fact No. 19.* However, as discussed *supra,* developments since that time rendered the buffer concept of the Malone tract obsolete. *See id.* The industrial developments on the north side of Horan Drive were controlled to protect the residential uses on the south side of Horan Drive. *See Findings of Fact No. 15.* Moreover, the hill between the Malone tract and the residential uses to the west

---

**20.** Plaintiffs also contend that Mr. Utterback's invocation of the reverter clause was a substantive departure. This Court views the use of the reverter clause as a procedural departure, but the characterization of said departure does not affect this Court's conclusion, *supra, that said* departure is not circum*stantial* proof of discriminatory intent. *See Findings of Fact No. 27.*

provides a natural buffer and the union hall property is a much more effective buffer than the Malone tract could ever be. *See Findings of Fact Nos. 13 and 18.* Thus, even though the rejection of the concept of the Malone tract as a buffer was a departure from the past, it is fully justified by the non-discriminatory, non-pretextual change of circumstances which occurred subsequent to the Malone tract being zoned "G–1". Said departure is not circumstantial proof of a racially discriminatory motive.

■ The final *Arlington Heights* factor that this Court must consider is the legislative history of the challenged action. The *Arlington Heights* Court stated that this factor "may be highly relevant, especially where there are contemporary statements by a couple members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. at 565. On this factor plaintiffs point to statements by a couple members of the Board of Aldermen over a long period of time which indicate bias against subsidized housing and/or black persons. Plaintiffs also point to the circulation of the so-called "hate letter." *See Findings of Fact No. 14.* Plaintiffs argue that these establish racially discriminatory intent. Plaintiffs' argument might have merit but for the fact that the Board of Aldermen voted on March 15, 1982, to zone the Malone tract "G–1" multiple family. Thus, any prior statements or opposition to Westview Heights on grounds that might have been construed as racial did not have a causal nexus to the challenged decision. Any racially motivated opposition that might have existed was defeated on March 15, 1982. The cause of the challenged action was Mayor Morgan's veto, which this Court has already concluded was not motivated by racial discrimination. *See Findings of Fact No. 34.*

■ In sum, application of the six (6) *Arlington Heights* factors leads this Court to conclude that defendant's action was not motivated, even in part, by racial discrimination. As in *Arlington Heights*, plaintiffs "simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in" defendant's decision. *Arlington Heights*, 429 U.S. at 270, 97 S.Ct. at 566, *cf. Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066–67 (4th Cir. 1982); *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 140–45 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Heritage Homes of Attleboro, Inc. v. Seekonk Water District*, 498 F.Supp. 463, 464–67 (D.Mass.1980), *aff'd as to liability and remanded*, 648 F.2d 761 (1st Cir.), *vacated*, 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981), *rev'd award of punitive damages*, 670 F.2d 1 (1st Cir.), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982), *cert. denied*, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 67 (1982). Accordingly, plaintiffs' claims under the equal protection clause of the fourteenth amendment and the Civil Rights Acts of 1866, 42 U.S.C. § 1981, 1982 and 1983, must fail and defendant is entitled to a judgment in its favor thereon.

### c. Fair Housing Act Claims

■ Plaintiffs' final allegation is that defendant, by refusing to zone the Malone tract "G–1" multiple family, violated §§ 3604(a) and 3617 of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. Section 3604(a) provides, in pertinent part, as follows:

> [I]t shall be unlawful ... [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

42 U.S.C. § 3604(a). Section 3617 provides, as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exer-

cise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

42 U.S.C. § 3617. As discussed *supra*, where a housing supplier plaintiff in an exclusionary zoning case proves a violation of § 3604(a) he also proves a violation of § 3617. There are situations where a § 3617 violation may occur without a violation of § 3604(a), but the allegations herein do not give rise to such a situation. *See* R. Schwemm, *Housing Discrimination Law* at 199 (1983). Accordingly, this Court will not separately analyze plaintiffs' § 3617 claim because the § 3604(a) analysis applies equally to said claim.

■ Congress' purpose in enacting the Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. There are two (2) ways to prove a violation of § 3604(a). The first is by proving discriminatory intent. As discussed *supra*, under the analysis of plaintiffs' equal protection claim, plaintiffs did not establish that defendant acted with discriminatory intent. Thus, this Court need only consider the second method of establishing a *prima facie* [21] violation of the Fair Housing Act: proof of discriminatory impact. *See Betsey v. Turtle Creek Associates*, 736 F.2d 983 at 986 (4th Cir.1984); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir.1982); *Halet v. Wend Investment Co.*, 672 F.2d 1305, 1311 (9th Cir.1982); *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 147–49 (3d Cir.1977) *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290–91 (7th Cir. 1977) *cert. denied*, 434 U.S. 1025, 98 S.Ct.

752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1186 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Atkins v. Robinson*, 545 F.Supp. 852, 866 (E.D.Va.1982); *United States v. City of Parma, Ohio*, 494 F.Supp. 1049, 1054–55 (N.D.Ohio 1980), *affd. in part and rev'd in part*, 661 F.2d 562 (6th Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). *See generally*, R. Schemm, *Housing Discrimination Law* at 126–27, 139–43 (1983).

■ A violation of the Fair Housing Act can be made out by proof of discriminatory effect alone, because the purpose of the Act is to promote integrated housing rather than simply outlaw invidious discrimination. *See* R. Schwemm, *Housing Discrimination Law* at 42–43, 127 (1983). For this reason, there are two types of discriminatory effects which can establish a *prima facie* case under the Fair Housing Act: 1) disproportionate adverse impact on one race; or 2) perpetuation of segregated housing patterns and prevention of interracial association. *Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977); *Atkins v. Robinson*, 545 F.Supp. 852, 867 (E.D.Va.1982). *See generally* R. Schwemm, *Housing Discrimination Law* at 140–41 (1983). As discussed *supra*, it is the opinion of this Court that defendant's action does not have a disproportionate adverse impact on black persons and said prior analysis need not be repeated here. The second type of effect requires an analysis of existing housing patterns and the impact that the proposed project is likely to have on those patterns.

---

**21.** As with Title VII employment discrimination cases, courts apply the *"prima facie* case" concept to Fair Housing Act claims. *See e.g., Betsey v. Turtle Creek Associates*, 736 F.2d 983 at 986 (4th Cir.1984). A few courts, most notably the Seventh Circuit, simply focus on four (4) "critical factors." *See, e.g., Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977). The difference between these two (2) approaches,

however, is primarily procedural and "[i]t is unlikely ... that these two methods of analysis will produce substantially different results in exclusionary zoning cases." R. Schwemm, *Housing Discrimination Law* at 142 n. 78 (1983). This Court prefers the Title VII—*prima facie* model. *See United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

Plaintiffs argue that defendant's refusal to zone the Malone tract "G–1" multiple family has the effect of perpetuating racially segregated housing patterns in the City of Fenton and the St. Louis area. Plaintiffs rely on the facts that no black persons reside in the City of Fenton and that, if Westview Heights were built, approximately ten (10) to fifteen (15) blacks would live there. *See Findings of Fact Nos. 22, 30.* In the opinion of this Court, the impact that Westview Heights might have on segregated housing patterns is insignificant and such a *de minimus* impact is not sufficient to establish a *prima facie* violation of the Fair Housing Act.

 The evidence established that there are racially segregated housing patterns in the St. Louis area. *See Findings of Fact Nos. 29, 30.* However, the St. Louis area is not a "donut, with Negroes in the hole and with mostly Whites occupying the ring." *Mahaley v. Cuyahoga Metropolitan Housing Authority,* 355 F.Supp. 1257, 1260 (N.D.Ohio 1973), *rev'd,* 500 F.2d 1087 (6th Cir.1974), *quoted in United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1186 (8th Cir.1974). Dr. Jones' testimony and report establishes that during the past twenty (20) years blacks have been migrating from St. Louis City to northern St. Louis County while southern St. Louis County remains predominantly white. *See Findings of Fact No. 30.* The statistical data presented by Dr. Jones shows that from 1–2% of southern St. Louis County is black, whereas the St. Louis metropolitan area is 12.5% black. *See id.* Thus, there is a significant underrepresentation of minorities in southern St. Louis County and the St. Louis area as a whole can accurately be characterized as racially segregated.

The evidence, however, did *not* establish that a significant number of blacks would move into Westview Heights if it were built. Dr. Farley did state that Fenton's action "contributes" to the continuation of segregated housing patterns in St. Louis, *see Findings of Fact No. 29,* but he failed to explain the reasoning behind his opinion and therefore this Court gives it only limit-

ed credence. It was Dr. Jones' opinion, on the other hand, that Westview Heights would have only a "miniscule" impact on racial segregation in St. Louis. *See Findings of Fact No. 30.* Unlike Dr. Farley's opinion, Dr. Jones' opinion is well-explained by a statement of his reasons. *See id.* For example, Dr. Jones concluded, based on credible statistics, that a substantial majority of the residents of Westview Heights would be white. *See id.* Dr. Farley actually concurred in this conclusion when he testified that he would expect the racial composition of Westview Heights to mirror that of the surrounding areas. *See Findings of Fact No. 29.*

In addition, other information provided by Dr. Jones strongly suggests that Westview Heights would not be inhabited by a significant number of blacks. Dr. Jones provided credible evidence that several social and political factors, unrelated to Fenton's action or governmental action of any type, result in many blacks voluntarily choosing to live in areas already inhabited by a significant number of blacks. *See Findings of Fact No. 30.* His conclusion was further supported by the facts that: 1) 48% of St. Louis County's black families can purchase 45% of Fenton's homes; 2) 25% of St. Louis City's black families can purchase 45% of Fenton's homes; and 3) in 1980 a large percentage of the St. Louis area's black families could afford to live in rental property located in or near the City of Fenton. *See id.*

 Based on the evidence presented in this action, this Court is left with the firm conviction that the construction of Westview Heights would have only a *de minimus* impact on the pattern of segregated housing in the St. Louis area and that the exclusion of Westview Heights would not contribute to the perpetuation of segregated housing in the St. Louis area, in southwestern St. Louis County or in the City of Fenton. *See Findings of Fact No. 36.* The facts in this case are far different from those in *United States v. City of Black Jack, Missouri,* 508 F.2d 1179 (8th Cir.

1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), where:

> [t]here was ample proof that *many blacks would live in the development,* and that the exclusion of the townhouses would contribute to the perpetuation of segregation in a community which was 99 percent white.

*Id.* at 1186 (emphasis added). Having concluded that plaintiffs failed to establish a *prima facie* case of a violation of the Fair Housing Act, it is unnecessary for this Court to determine whether defendant successfully rebutted plaintiffs' case.

### CONCLUSION

This Court does not necessarily approve of the manner in which the City of Fenton dealt with the Malones as individuals and a judgment for defendant should not be construed as such. However, defendant's refusal to zone the Malone tract "G–1" multiple family was not motivated by concerns which violated the equal protection clause of the fourteenth amendment, and did not result in discriminatory effects which violated the Fair Housing Act. Accordingly, judgment is entered for defendant.